## PHILOMATH COLLEGE *v.* WYATT.

[31 Pac. 206; 37 Pac. 1022; 26 L. R. A. 68.]

1. VOLUNTARY ASSOCIATIONS — VALIDITY OF RULES AND REGULATIONS — DISSENT OF MEMBERS.— The validity and binding effect of a constitution, bylaw, or proceeding of a voluntary society, as among its members, rests upon their actual or implied assent; those who remain in, as well as those who join, such an organization, are presumed to know its rules and they must comply with them. If a member of a voluntary association wishes to avoid a rule lawfully adopted he must secure its repeal or withdraw; dissent and protest are alike useless if he remains a member. Per MOORE, J.

NOTE.—This case was first decided by Judge MOORE on October fifth, eighteen hundred and ninety-three, when the Supreme Court consisted of LORD, C. J., and BEAN and MOORE, JJ. Judge BEAN, having taken part in the trial on the circuit has not participated in any of the appellate proceedings. After a rehearing had been granted the case was argued a second time but no decision had been rendered when Judge WOLVERTON succeeded Judge LORD on the 'supreme bench in July, eighteen hundred and ninety-four. This necessitated a third argument which was had July twenty-third, eighteen hundred and ninety-four. After this very elaborate and exhaustive hearing Judge WOLVERTON rendered an opinion on October eighth, eighteen hundred and ninety-four, which differs in its conclusion from the first opinion ren-

2. ADOPTION OF CONSTITUTION BY RELIGIOUS SOCIETY.— A general conference, the highest legislative and ecclesiastical body of a certain church, a voluntary religious society, framed and adopted a constitution, and issued a circular to the members of the church, giving notice that a ratification thereof would be asked at the next conference. The delegates thereto, empowered to ratify or reject the constitution, did not adopt it, but framed and adopted another, somewhat different. *Held,* that their delegated power authorized them to do this. Per MOORE, J.

3. PRESUMPTION OF GENUINENESS FROM LONG-CONTINUED USE—CODE, § 776, SUBDIVISION 35.— The constitution of eighteen hundred and forty-one of the voluntary religious organization known as the Church of the United Brethren in Christ is the organic law and constitution of that church. It has been acted upon as the true organic law for more than twenty years by persons having an interest in the question, and, under section 776, subdivision 35 of Hill's Code, must be considered genuine. Per MOORE and WOLVERTON, JJ.; BEAN, C. J., not sitting. (See headnote 15.)

4. AMENDMENT OF CONSTITUTIONS—"REQUEST" DEFINED.—There are two methods of amending a constitution: one, by a convention; the other, through a general assembly, without a convention—both regularly followed by a ratification by the people. In case the latter method is pursued every requirement of the instrument itself must be carefully observed. Where, therefore, a constitution provided that it should not be amended "unless by request of two thirds of the whole society," no amendment can be made until after two thirds of the members have asked for some action looking to that end. The word "request" in such a connection means an asking. Per MOORE, J.; WOLVERTON, J., dissenting; BEAN, C. J., not sitting. (See headnote 18.)

5. AMENDMENT OF CONSTITUTION OF THE CHURCH OF THE UNITED BRETHREN IN CHRIST.— If it be conceded that the vote of the general conference of eighteen hundred and eighty-five of the Church of the United Brethren in Christ upon certain proposed amendments to the constitution was a "request," within the meaning of that word as used in the church constitution, still the request was insufficient, for the affirmative vote lacked more than sixty-five hundred of the necessary two thirds of the actual membership of the whole society. Per MOORE, J.; WOLVERTON, J., dissenting; BEAN, C. J., not sitting. (See headnote 21.)

6. AMENDMENT OF CONSTITUTION—"REQUEST" DEFINED.— A vote of the members of a society on the adoption of an amended constitution can-

dered, though on several legal propositions the two judges agree. Under the general rule the opinion of the lower court stood affirmed. It will be noticed that both opinions are written from one statement of facts. For convenience of reference the headnotes and corresponding paragraphs of the opinions are numbered consecutively through the entire case. Publication has been delayed because the judges were undecided as to whether their opinions ought to be issued as the utterances of the court, in view of their inability to agree. As the case has been published elsewhere, and has been cited in other courts as an Oregon decision, and as the two judges concur on several legal propositions which are of general application, both opinions are now published by direction of the court.— REPORTER.

not be considered a "request" to amend the old constitution, within the meaning of a provision that the instrument can be amended only "by request." In such a case the word "request" means that there must be an active solicitation by the required number of members for some amendment prior to its being proposed. Per MOORE, J.; WOLVERTON, J., dissenting; BEAN, C. J., not sitting. ( See headnote 18.)

7. ELECTIONS — CONSENT OF THOSE NOT VOTING.— It is only when an election is authorized by law that the absent electors can be bound by the expression of those electors who attend. In the case of a voluntary election the required proportion of electors must actually vote for the measure. Per MOORE, J.; WOLVERTON, J., dissenting; BEAN, C. J., not sitting. ( See headnotes 20, 21.)

8. IMPLIED CONSTITUTIONAL PROHIBITION — ELECTIONS.— A provision in a constitution that there shall be no alteration thereof " except on request of two thirds of the society " contains an implied prohibition of an election on a proposed amendment without such request, so that any election so held on the proposed amendments would be entirely voluntary and unauthorized. Per MOORE, J.; WOLVERTON, J., dissenting; BEAN, C. J., not sitting. ( See headnotes, 16, 21.)

9. THE ELECTION OF EIGHTEEN HUNDRED AND EIGHTY–EIGHT ON THE ADOPTION OF THE AMENDED CONSTITUTION OF THE CHURCH OF THE UNITED BRETHREN IN CHRIST WAS BOTH VOLUNTARY AND VOID: voluntary, because it was not held pursuant to any law, but, on the contrary was impliedly prohibited by the constitution then in force; and it was void because no amendment of the constitution had been asked for by two thirds of the society. This election, then, not being authorized by any law, but being purely voluntary, the rule that in an authorized election the consent of those not voting will be presumed cannot apply. Per MOORE, J.; WOLVERTON, J., dissenting; BEAN, C. J., not sitting. ( See headnote 21.)

10. JURISDICTION OF CIVIL COURTS TO REVIEW DECISIONS OF CHURCH TRIBUNALS.— When questions of faith or of ecclesiastical law have been decided by the highest judicial tribunal provided for in the church organization, the civil courts will follow such decisions, but the regularity and legality of legislative acts of church bodies is always open to investigation. Within the scope of this rule the action of the general conference of eighteen hundred and eighty-nine of the Church of the United Brethren in Christ in adopting the report of a committee declaring that the amended constitution and confession of faith proposed by the general conference of eighteen hundred and eighty-five, and which had been voted upon by the church at large in November, eighteen hundred and eighty-eight, had become and was the organic law of the church, was not a judicial decision that is binding on the civil courts: it was rather a legislative act, and as such reviewable outside the ecclesiastical judicatories. Per MOORE and WOLVERTON, JJ.; BEAN, C. J., not sitting. ( See headnote 13.)

11. Religious Societies — Church Identity.— Church identity, when disputes arise, depends not alone upon the peculiar creed and dogmas of the church, but also upon its constitution and form of government, discipline, usages, customs, and principles previously maintained.   Per Wolverton, J.

12. Religious Societies—'Church Identity.— Incorporating into the confession of faith of a church doctrines previously contained in its discipline, to which all members of the church must subscribe before they can become such, does not constitute a material and vital change which will destroy the identity of the church, under a constitutional provision prohibiting any change of such confession.   Per Wolverton, J.

13. Change of Constitution of Religious Societies— Conclusiveness of Decisions by Church Tribunals.— The action of the highest ecclesiastical body of a religious sect, in adopting the report of a committee appointed to determine the validity of a constitutional amendment and to submit it to the vote of its members, the amendment being adopted by the adoption of the report, is legislative, and not an adjudication binding on civil courts, within the rule concerning the binding effect of decisions by church tribunals on questions of faith or of ecclesiastical law or custom.   The action, then, of the general conference of eighteen hundred and eighty-nine of the Church of the United Brethren in Christ in adopting the report of the committee of seven, to the effect that the revised confession of faith and constitution proposed by the general conference of eighteen hundred and eighty-five, had been adopted and carried at the election in November, eighteen hundred and eighty-eight, and should be so recognized upon proclamation by the board of bishops, was purely legislative, and open to review in the civil courts.   Per Wolverton and Moore, JJ. (See headnote 10.)

14. Review by Civil Courts of Legislative Acts of Religious Assemblies.— Where the legislative body of a religious sect, in adopting amended articles of belief, stated that they were in substance the same as the old, and in the debate before their adoption they were not attacked as being different therefrom, and bishops testified that there was no material*alteration, and the only change appeared to be a gathering under the head of articles of belief of what was formerly scattered through the book of discipline, the action of such body will be followed by the courts of law, for the respect which coördinate branches of a government owe one another ought also to exist between civil and religious bodies.   The civil courts should respect and even adopt a construction of the legislative acts of an ecclesiastical body which it has itself placed upon them acting in its legislative capacity, unless it is shown to be clearly and palpably contrary to some constitutional prohibition.   Since, then, the general conference of eighteen hundred and eighty-nine of the Church of the United Brethren in Christ has legislatively determined that the amended articles of faith voted upon in eighteen hundred and eighty-eight have not wrought a substantial change in the fundamental doc-

27 Or.— 50.

trines of that church, the civil courts ought to acquiesce therein. Per WOLVERTON, J.

15. LONG ACQUIESCENCE— PRESUMPTION.— Acquiescence in and use of the constitution of a church for more than fifty years is conclusive on the civil courts as to its validity. Per WOLVERTON and MOORE, JJ.; BEAN, C. J., not sitting. (See headnote 3.)

16. CONSTITUTIONAL CONSTRUCTION.— The constitution of the Church of the United Brethren in Christ, adopted in eighteen hundred and forty-one, should be construed as state constitutions are construed, that is, as a limitation on the legislative body, and not as a special grant of power; so that the general conference of that church ought to be regarded as having all the accustomed powers of legislation, except as they are limited or prohibited by that constitution. Per WOLVERTON, J.; MOORE, J., dissenting; BEAN, C. J., not sitting. (See headnote 8.)

17. RESULT OF UNCONSTITUTIONAL LEGISLATION —RELIGIOUS SOCIETIES—TITLE TO CHURCH PROPERTY.— The illegal adoption of a new constitution by the general conference of a church, which constitutes its highest legislative and judicial body, does not constitute an act of secession or destroy the identity of the church, where the changes made by the new constitution are not substantial or radical, and the proper remedy for those who are dissatisfied is to apply to the civil courts to determine the validity of the adoption. Within this rule the action of the general conference of eighteen hundred and eighty-nine of the Church of the United Brethren in Christ in adopting a new constitution was valid and legal, for this new document was not so different from the constitution of eighteen hundred and forty-one as to affect the church identity; and therefore the title to the church property remains in that part of the organization that followed the new constitution, and does not belong to those who seceded. Per WOLVERTON, J.; MOORE, J., dissenting; BEAN, C. J., not sitting.

18. CHANGE OF CONSTITUTION— CONSTRUCTION OF THE WORD "REQUEST."— The word "request," as used in the expression "request of two thirds of the whole society," which is required by the constitution of eighteen hundred and forty-one of the Church of the United Brethren in Christ in order to effect a change thereof, is not to be construed technically, or to mean a request antecedent to a vote, but it is sufficient if there is an expressed willingness of the requisite number that a certain amendment shall go into effect. Per WOLVERTON, J.; MOORE, J., dissenting; BEAN, C. J., not sitting. (See headnotes 4, 6.)

19. DELEGATION OF LEGISLATIVE POWER.— Legislative power is not delegated to a commission appointed by the general conference of a church to prepare proposed changes in the constitution, where the general conference itself passes upon the report of the commission. Per WOLVERTON, J.

20. POWER OF LEGISLATURE TO ESTABLISH RULES FOR DETERMINING RESULTS OF ELECTIONS.— A legislature may adopt any rule for ascertaining the popular will which it considers best adapted to accomplish that end, pro-

vided it acts within the limitations of the constitution; thus, the general conference of a church, acting in its legislative capacity, may declare that two thirds of the votes cast at a certain election shall be the basis of ascertaining the wishes of the church with reference to a change of the constitution and confession of faith, for which the constitution requires the request of "two thirds of the whole society." Per WOLVERTON, J.: MOORE, J., dissenting; BEAN, C. J., not sitting.   (See headnotes 7, 9.)

21. ELECTIONS — PRESUMED CONSENT OF THOSE NOT VOTING.—The election of November, eighteen hundred and eighty-eight, on the adoption of a revised constitution for the Church of the United Brethren in Christ* was legally provided for by the general conference of eighteen hundred and eighty-five, and those who voted on that occasion must be considered as constituting the society, under the rule that at a regular election only those voting can be considered, unless the law providing for the election otherwise declares. Per WOLVERTON, J.; MOORE, J., dissenting; BEAN, C. J., not sitting.   (See headnotes 5, 7, 8, 9.)

22. CONSTITUTIONAL POWER OF AMENDMENT.— A limitation upon the power of the general conference of a church "to change or do away with the confession of faith as it now stands," may itself be legally changed by the church under a general provision for amendments. Per WOLVERTON, J.

23. RELIGIOUS SOCIETIES — CONSTITUTIONAL LIMITATIONS.—Changes in the confession of faith tending to clearness and completeness of declaration of belief in the doctrines actually held by the church may be made without violating a prohibition against changing or doing away with the confession of faith. Per WOLVERTON, J.

## APPEAL from Benton: MARTIN L. PIPES, Judge.

*The litigation growing out of the adoption of the new constitution for the Church of the United Brethren in Christ has been especially protracted, and is still continuing in different states. The following cases are all directly on the very questions discussed by Judge MOORE and Judge WOLVERTON: *Lamb* v. *Cain,* 129 Ind. 486 (14 L. R. A. 518, 29 N. E. 13); *Schlichter* v. *Keiter,* 156 Pa. St. 119 (22 L. R. A. 161, 27 Atl. 45); *Bear* v. *Heasley,* 98 Mich. 79 (24 L. R. A. 615, 57 N. W. 270); *Brundage* v. *Deardorf* (Ohio), 55 Fed. 840; *Russie* v. *Brazzell* (Mo.), 30 S. W. 526; *Kuns* v. *Robertson,* 154 Ill. 394 (40 N. E. 343).

Almost the same questions have been raised and discussed in the litigation consequent on the division of the Evangelical Association of North America: *Schweiker* v. *Husser,* 146 Ill. 399 (34 N. E. 1022).

For a discussion of the power of civil courts to decide property rights of religious societies see *Mt. Zion Baptist Church* v. *Whitmore,* 13 L. R. A. 198, with note (83 Iowa, 138); *Finley* v. *Brent,* 11 L. R. A. 214 (87 Va. 103); and *Smith* v. *Pedigo* (Ind.), 19 L. R. A. 483. There is a note with *Mt. Zion Baptist Church* v. *Whitmore,* 13 L. R. A. 198, on the law by which questions of church doctrine are to be decided, and the jurisdiction of civil courts over religious associations. For a note on the power of civil courts to review the excommunication of a member from a church see *Nance* v. *Busby,* 15 L. R. A. 801 (91 Tenn. 303).—REPORTER.

This is a suit brought by Philomath College to enjoin E. C. Wyatt and others from acting as trustees of the plaintiff, or exercising any control over its property or franchises, and is a controversy among the members of the church known as the "United Brethren in Christ." It involves two alleged constitutions and two alleged confessions of faith. The defendants claim that the original constitution of eighteen hundred and forty-one, and the original confession of faith of eighteen hundred and fifteen, have not been constitutionally changed, and are still in force, and that those who adhere to that constitution and confession are the only true members of the faith, and are entitled to the use and control of the church property; while the plaintiff insists that a new and different constitution and confession were adopted in eighteen hundred and eighty-nine, and that those who adhere to the new and reject the old are the meek and lowly followers of the real church, and, incidentally, are entitled to the occupation and enjoyment of the ecclesiastical revenues.

The plaintiff is a corporation, duly incorporated under the laws of this state on or about November, eighteen hundred and sixty-five, to conduct a literary institution at Philomath, Benton County, Oregon, for the church known as the "United Brethren in Christ." The object of this corporation was and is to acquire and hold property in trust for said church, and to build and maintain an institution for educational purposes, to be carried on under the direction and control of trustees, to be appointed from time to time by the Oregon Conference of the United Brethren in Christ, in accordance with the established usages and customs of said church. The said church is an unincorporated, voluntary, religious association in the United States, having official bodies for the government of the church, its members, congregations,

and officers, each being clothed with certain powers, to wit: (1.) The official board of each congregation consists of the recognized preachers, exhorters, leaders, stewards, trustees, and Sunday-school superintendents, who reside within the bounds of the congregation, or hold membership therein. This board meets monthly, and transacts the business of the congregation. (2.) The quarterly conference, composed of the presiding elder of the district, and the preacher in charge, and recognized preachers, class leaders, and stewards, trustees, and Sunday-school superintendents, who reside within the district, or hold membership therein. It meets quarterly, and, among other things, appoints trustees of the meeting-houses, who hold during the pleasure of the quarterly conference. (3.) The annual conference is composed of the elders and licentiate preachers who have been received by the annual conference in each district. This conference meets yearly, and is presided over by a bishop. (4.) The general conference, which meets every four years, is composed of elders elected by the church members in every conference district throughout the society. The official board is subordinate to the quarterly conference, the quarterly conference to the annual conference, and the annual conference to the general conference, the last being the highest legislative and judicial body of the church.

This church was organized as a religious society some time prior to the year eighteen hundred. No general conference of the church was held until eighteen hundred and fifteen, when, on the sixth of June of that year, the first general conference was held at Mount Pleasant, Pennsylvania, in pursuance of a call which before that time had been made. This conference formulated a discipline which contained the rules and doc-

trine, or the confession of faith, of the church. Some changes in the phraseology of the last clause of this confession of faith was made by the subsequent general conferences of the church of eighteen hundred and nineteen, eighteen hundred and twenty-five, eighteen hundred and thirty-three, eighteen hundred and thirty-seven, eighteen hundred and forty-one, and eighteen hundred and fifty-seven. Certain persons, claiming to be the legally elected trustees of the plaintiff, have instituted this suit in the name of and on behalf of the plaintiff against the defendants, who claim, on their part, to be the legally elected trustees of the plaintiff, and deny the title to such offices of the persons who are conducting this suit in the plaintiff's name. At the time this suit was instituted there was some question made of the regularity of the election of those who instituted the suit, but all these questions have been heretofore waived on each side, except the one single issue whether the religious body from which plaintiff trustees derive their title is the true church of the United Brethren in Christ, or whether the religious body from which defendants derive their title is the true church of that name. It is admitted that each set of trustees was elected by an annual conference claiming to be the annual conference of the said church in Oregon. Which of the two conferences was the real conference, is the question, and is decisive of this suit. It is also agreed that since the beginning of this suit the terms of office of some of the trustees on each side have expired and been filled by elections pending this suit, and that these new trustees shall be substituted in the decree to be rendered here in lieu of the old ones.

The confession of faith adopted by the general conference of eighteen hundred and fifteen was as follows:—

### OLD CONFESSION OF FAITH.

In the name of God, we declare and confess before all men that we believe in the only true God, the Father, the Son, and the Holy Ghost; that these three are one, — the Father in the Son, the Son in the Father, and the Holy Ghost equal in essence or being with both; that this tri-une God created the heavens and the earth, and all that in them is, visible as well as invisible; and, furthermore, sustains, governs, protects, and supports the same.   We believe in Jesus Christ; that he is very God and man; that he became incarnate by the power of the Holy Ghost in the Virgin Mary, and was born of her; that he is the Savior and Mediator of the whole human race, if they with full faith in him accept the grace proffered in Jesus; that this Jesus suffered and died on the cross for us, was buried, arose again on the third day, ascended into heaven, and sitteth on the right hand of God to intercede for us; and that he shall come again at the last day to judge the quick and the dead.   We believe in the Holy Ghost; that he is equal in being with the Father and the Son, and that he comforts the faithful and guides them into all truth.   We believe in a Holy Christian Church, the communion of saints, the resurrection of the body, and life everlasting.   We believe that the Holy Bible, Old and New Testaments, is the Word of God; that it contains the only true way to our salvation; that every true Christian is bound to acknowledge and receive it, with the influence of the spirit of God, as the only rule and guide, and that without faith in Jesus Christ, true repentance, forgiveness of sins, and following after Christ, no one can be a true Christian.   We also believe that what is contained in the Holy Scriptures, to wit, the fall in Adam, and redemption through Jesus Christ, shall be preached throughout the world.   We believe that the ordinances, viz., baptism, and the remembrance of the

sufferings and death of our Lord Jesus Christ, are to be in use and preached by all Christian societies; and that it is incumbent on all the children of God particularly to practice them; but the manner in which, ought always to be left to the judgment and understanding of every individual; also, the example of washing feet is left to the judgment of every one, to practice or not; but it is not becoming of any of our preachers or members to traduce any of their brethren, whose judgment and understanding in these respects is different from their own, either in public or private. Whosoever shall make himself guilty in this respect shall be considered a traducer of his brethren, and shall be answerable for the same.

This confession of faith was never submitted for ratification or adoption to a vote of the members of the church, but became the confession of faith and doctrine of the church by reason of its adoption by the delegates to this general conference, and as such it remained until the meeting of the general conference held in May, eighteen hundred and eighty-nine.

At a meeting of the general conference of this church held at Germantown, Ohio, on May tenth, eighteen hundred and thirty-seven, it was resolved that a constitution should be formed for the better government of the church. This general conference thereupon formed the following:

We, as the members of the Church of the United Brethren in Christ, in order to retain a perfect union, accomplish the ends of justice and equity, insure ecclesiastical as well as domestic tranquility, provide for the common interest of the church, promote the general welfare of society, and to secure the blessings of the gospel to ourselves, our posterity, and our fellow men in general, ordain and establish the following constitution for the church aforesaid:—

### ARTICLE I.

Section 1.   All ecclesiastical power herein granted to make or repeal any rule in discipline shall be vested in a general conference, which shall consist of ministers elected by the members in every conference district throughout the society; nevertheless, nothing shall be done so as to change the articles of faith, or in anywise destroy the itinerant plan.

Section 2.   No minister shall be considered eligible for election until he has stood in the capacity of elder for the term of three years, having maintained a good moral character during that time.   Any elder receiving a transfer from one conference to another, shall not be considered eligible for election under a term of two years, and not then without a sufficient recommendation from the conference of which he had been a member.

Section 3.   The number of delegates from each conference district shall not exceed one for every five hundred members.   But should it so happen that a conference would be formed in a territory not having five hundred members within its district, that conference shall nevertheless have one delegate to represent its members in general conference.

Section 4.   If any vacancies should occur through sickness or otherwise, after the election of delegates, it shall be the duty of the presiding elder or elders to immediately notify the next highest on the list of votes that he is now a member to represent that district in the ensuing general conference.

Section 5.   The bishops shall upon all occasions be considered members of the general conference, to preside as the organs of that body, as in annual conferences. Bishops shall be elected every four years, during the sitting of the general conference, by the members thereof,

from among the elders throughout the church, who have stood in that capacity for a term, not less than six years.

Section 6.    The general conference shall be held once every four years, at the adjournment of which it shall be the duty of the same to publish, or cause to be published, (excepting such parts as may not be considered expedient) all their proceedings for the benefit of society in general.

### ARTICLE II.

Section 1.    The members of each conference district shall solely have the privilege of choosing and electing the delegates to general conference, which shall invariably be done at least three months previous to the sitting of the same.

Section 2.    In the election of delegates for general conference, it shall be the duty of each annual conference to appoint a committee of three in their several conference districts to receive and count the votes, and immediately apprise those who may have been elected.

Section 3.    It shall be the duty of the annual conference to furnish the presiding elders with a list of all the elders eligible for election.    The presiding elders shall furnish each circuit preacher in charge, whose duty it shall be to furnish each class leader or steward throughout the circuit, with a copy of the same.

Section 4.    It shall be the duty of each class leader or steward to appoint a meeting of the members of each class, for the purpose of electing, by ballot or otherwise, one or more delegates to represent them in general conference.

Section 5.    It shall be the duty of each class leader or steward to sign, enclose, and seal each bill of election, hand it over to the preacher in charge, he again to the presiding elder, whose duty it shall be to transmit the

same to the committee appointed by the annual conference.

Section 6.   The committee appointed to count the votes shall make a list of all the persons voted for, and the number of votes for each.   Should any two or more of the candidates have an equal number of votes, the individuals thus appointed shall determine by lot who or which of them are elected.   They shall also forward the names of those elected to the conference printing establishment for publication.

### ARTICLE III.

Section 1.   Each annual conference shall come fully under the jurisdiction of the general conference, except under such regulations as the general conference may deem expedient in relation to local matters, so as not to prove prejudicial to the interest of the whole society.

Section 2.   The business of each annual conference shall strictly be done according to discipline.

Section 3.   Any annual conference acting in violation of the doings of general conference, shall, by impeachment, be tried by the same.

Section 4.   No annual conference shall have the exclusive right to form or admit a new conference within the bounds of society, without the consent of the general conference.

Section 5.   All officers, whether bishops, presiding elders, etc., shall, on impeachment, be dealt with according to discipline, as other members, expelled or retained, as the case may require.

### ARTICLE IV.

Section 1.   If at any time after passing this constitution it should be contemplated either to alter or to amend the same, it shall be the privilege of any member in

society to publish or cause to be published such contemplation at least three months before the election of delegates to the general conference.

Section 2.   No general conference shall have the power to alter or amend the foregoing constitution, except it be by a vote of two thirds of that body.

### RESOLUTIONS.

Inasmuch as it is the indefeasible right of every man to think and act for himself in matters of faith and morality, this right not only being granted by the charter of his creation, but also by the discipline adopted for the better government of the Church of the United Brethren in Christ; be it

*Resolved,* therefore, *first,* that no rule be adopted by general conference so as to infringe upon the rights of any, as it relates to the mode and manner of baptism, the sacrament of the Lord's supper, or the washing of feet, etc.; *second,* no rule or ordinance shall be passed in general conference so as to deprive the local preachers of the eligibility of election as delegates to the same, nor yet to deprive them of their legal vote in the annual conference to which they severally belong; *third,* that the foregoing resolutions shall neither be altered or repealed without the unanimous consent of the whole conference.

Done in general conference by the unanimous consent of that body this eleventh day of May, in the year of our Lord, one thousand eight hundred and thirty-seven.

In witness whereof, we have hereunto set our names: H. Kumler, Samuel Hiestand, bishops; Jacob Erb, Jacob Winter, Jacob Rhinehart, J. J. Glossbrenner, Adam Hetzler, George Hiskey, John Coons, William Hanby, John Featherhoff, William Stubbs, Francis Whitcom, John

Lopp, Fred Kennoyer, David Weimer, John Dorcas, William Davis.

This was the first constitution ever prepared for or approved by any general conference of the church. That body, doubting its right or power to adopt such an instrument, issued a circular to the membership of the church, as follows:—

CIRCULAR.

*To the members of the Church of the United Brethern in Christ throughout these United States:* Dear Brethern, by whose authority we, as a general conference, have been authorized to legislate on matters pertaining to the government of our church, and having long since been convinced of the great necessity of a constitution for the better regulation thereof, have, by unanimous consent, framed and established the foregoing. We are well aware that we have transcended the bounds given us by our discipline, which will be found in the constitution, (article IV, section 2,) declaring that the said constitution can neither be altered or amended without a majority of two thirds of a general conference. If there had been a general notice given to the church previous to the election of delegates, that there would be a memorial offered to general conference praying them to adopt a constitution, and to ratify it, agreeable to article IV, section 2, then the general conference would have had power to have done so. The object of this circular is (feeling that the government of our church is not as firm as it ought to be) to give notice to our church throughout the Union that we intend to present a memorial to the next general conference, praying them to ratify the constitution now adopted, according to article IV, section 2, in testimony of our ardent desire for the welfare of our church and the general spread of the gospel.

Written by order of the general conference, German-town, Ohio, May twelfth, eighteen hundred and thirty-seven. Signed, in behalf of the same, by William R. Rhinehart, secretary.

This constitution and circular were printed in the discipline issued that year from the conference office at Circleville, Ohio, and circulated by order of the general conference among the membership.

The next general conference of this church met in Pickaway County, Ohio, on the tenth of May, eighteen hundred and forty-one. This conference did not ratify the constitution framed by the preceding general conference, but adopted another. A motion was made in the conference that a constitution for the better government of the church be adopted. On the following day the motion for a constitution was called up, a spirited discussion ensued, the vote was taken and carried in favor of a constitution,—yeas, fifteen; nays, seven. On motion a committee of nine,—one from each conference district,—was appointed to draft a constitution. This committee reported a constitution, which was read twice and laid upon the table until the following morning, when it was read third time by sections and adopted. This constitution was as follows:—

CONSTITUTION OF EIGHTEEN HUNDRED AND FORTY-ONE.

We, the members of the Church of the United Brethren in Christ, in the name of God, do, for the perfecting of the saints, for the work of the ministry, for the edifying of the body of Christ, as well as to produce and secure a uniform mode of action in faith and practice; also, to define the powers and business of quarterly, annual, and general conferences, as recognized by this church, ordain the following articles of constitution:—

### ARTICLE I.

Section 1.   All ecclesiastical power herein granted, to make or repeal any rule of discipline is vested in a general conference, which shall consist of elders elected by the members in every conference district throughout the society; *provided, however,* such elders have stood in that capacity three years in the conference district to which they belong.

Section 2.   General conference is to be held every four years; the bishops to be considered members and presiding officers.

Section 3.   Each annual conference shall place before the society the names of all the elders eligible to membership in the general conference.

### ARTICLE II.

Section 1.   The general conference shall define the boundaries of the annual conferences.

Section 2.   The general conference shall at every session elect bishops from among the elders throughout the church, who have stood six years in that capacity.

Section 3.   The business of each annual conference shall be done strictly according to discipline; and any annual conference acting contrary thereto shall, by impeachment, be tried by the general conference.

Section 4.   No rule or ordinance shall at any time be passed to change or do away with the confession of faith as it now stands, nor to destroy the itinerant plan.

Section 5.   There shall be no rule adopted that will infringe upon the rights of any as relates to the mode of baptism, the sacrament of the Lord's supper, or the washing of feet.

Section 6.   There shall be no rule made that will deprive local preachers of their votes in the annual conference to which they severally belong.

Section 7. There shall be no connection with secret combinations, nor shall involuntary servitude be tolerated in any way.

Section 8. The right of appeal shall be inviolate.

### ARTICLE III.

The right, title, interest, and claim of all property, whether consisting in lots of ground, meeting-houses, legacies, or donation of any kind, obtained by purchase or otherwise, by any person or persons, for the use, benefit, and behoof of the Church of the United Brethren in Christ, is hereby fully recognized and held to be the property of the church aforesaid.

### ARTICLE IV.

There shall be no alteration of the foregoing constitution, unless by request of two thirds of the whole society.

This constitution, together with the confession of faith which had before that time been adopted, was printed as the constitution and confession of faith of the church in the discipline of that year, and in each succeeding discipline every four years thereafter up to the year eighteen hundred and eighty-nine. This constitution was never submitted to the members of the church for their approval or disapproval, but went into force immediately, by virtue of its adoption by said general conference, and so remained until May thirteenth, eighteen hundred and eighty-nine. General conferences of the church were held every four years from eighteen hundred and forty-one up to and including eighteen hundred and eighty-nine, when the last one prior to this suit was held. A regular general conference of the church was held at Fostoria, Ohio, commencing May fourteenth, eighteen hundred and eighty-five, composed of delegates duly and

regularly chosen under the rules and regulations of the church provided therefor. At this conference, on the second day, twenty-two standing committees were appointed. The committee on revision (to which was referred the confession of faith, constitution, and section 3 of chapter X of the discipline) consisted of thirteen members, and was known and designated as "Committee Number Six." On the afternoon of the sixth day this committee made the following report:—

### REPORT OF COMMITTEE NUMBER SIX.

*To the General Conference:* Your committee, to which was referred the confession of faith, constitution, and section 3 of chapter X of the discipline, beg leave to report that we have given these subjects much and most prayerful attention, and now submit the result of our deliberations: *First,* we find that the present constitution of the church was never submitted to the suffrage of the members and ministry of the church for ratification, either by popular vote or by conventional approval, though it purports to be the constitution of the "members" of the denomination. *Second,* we find by reference to the records, that throughout most of its history it has been the subject of question and difference of opinion as to its legality and binding force as an organic law. *Third,* we find also that the clause found in article II, section 4, which says: "No rule or ordinance shall at any time be passed to change or do away with the confession of faith as it now stands"; and article IV, which says: "There shall be no alteration of the foregoing constitution unless by request of two thirds of the whole society," are in their language and apparent meaning so far-reaching as to render them extraordinary and impracticable as articles of constitutional law. *Fourth,* from the facts and reasons thus indicated we conclude that the constitution has acquired its

27 OR.—52.

force only by the partial and silent assent of the church, and that the general conference has a right to institute measures looking to the amendment, modification, or change of the constitution at any time, when it is believed that a majority of our people favor a modification thereof. *Fifth,* it is the sense and belief of your committee that the constitution as it now stands is not in harmony with the present wishes of our people, as has been indicated in discussions, petitions, and elections during the past year. *Sixth,* for these reasons, and for the purpose of finally settling all questions of dispute and matters of disturbance to the peace and harmony of the church, so far as the confession of faith and the constitution are concerned, your committee would recommend the adoption of the following paper, namely:—

### CHURCH COMMISSION.

"Whereas our confession of faith is silent or ambiguous upon some of the cardinal doctrines of the Bible, as held and believed by our church; and whereas it is desirable and needful to so amend and improve our present constitution as to adapt its provisions more fully to the wants and conditions of the church in this and future time; therefore,

"*Resolved,* By the delegates of the annual conferences of the Church of the United Brethren in Christ, in general conference assembled, that a church commission, composed of twenty-seven persons, and consisting of the bishops of the church, and ministers and laymen appointed and elected by this body, an equal number from each bishop's district, provided that the Pacific district shall have two members besides its bishop,—be and is hereby authorized and established. The duties and powers of this commission shall be to consider our present confession of faith and constitution, and prepare

such a form of belief and such fundamental rules for the government of this church in the future, as will, in their judgment, be best adapted to secure its growth and efficiency in the work of evangelizing the world; *provided,* (1.) That this commission shall preserve unchanged in substance the present confession of faith so far as it is clear; (2.) That it shall also retain the present itinerant plan; (3.) That it shall keep sacred the general usages and distinctive principles of the church on all great moral reforms as sustained by the word of God, in so far as the province of their work may touch them; *provided, further,* that in the final adoption, as a whole, of a confession of faith and constitution, for submission to the church by the commission, a majority vote of all the members composing the commission shall be necessary.

"*Resolved,* That this commission shall meet at such time and place as the board of bishops may appoint, and is expected to complete its work by January first, eighteen hundred and eighty-six. The commission shall also adopt and cause to be executed a plan by which the proposed confession of faith and constitution may receive the largest possible attention and expression of approval or disapproval by our people, including all necessary regulations for taking, counting, and reporting the vote,

"*Resolved,* That when, according to the foregoing provisions, the result of the vote of the church shows that two thirds of all the votes cast have been given in approval of the proposed confession of faith and constitution, it shall be the duty of the bishops to publish and proclaim said result through the official organs of the church, whereupon the confession of faith and constitution thus ratified and adopted shall become the fundamental belief and organic law of this church; *provided, further,* that the adoption of this constitution aforesaid

shall in no wise affect any legislation of this general conference for the coming quadrennium.

"*Resolved,* That in case of any vacancy in the commission, by death, resignation, or otherwise, the commission shall fill the vacancy. The necessary expenses of this commission shall be paid out of the funds of the printing establishment. Respectfully submitted."

This report was signed by eleven members of the committee, who also presented the following:—

### SUPPLEMENTARY REPORT.

"We recommend that the following law in relation to secret combinations be adopted, to take the place of section 3, chapter X of discipline:—

### SECRET COMBINATIONS.

"A secret combination, in the sense of the constitution, is a secret league or confederation of persons holding principles and laws at variance with the word of God, and infringing upon the natural, social, political, or religious rights of those outside its pale. Any member or minister of our church found in connection with such combination shall be dealt with as in other cases of disobedience to the order and discipline of the church in case of members, as found on page 23 of discipline, in answer to the third question of section 3, chapter IV, and in case of ministers as found in chapter VI, section 13, page 65. Respectfully submitted."

Two members of the committee did not sign the foregoing reports, but prepared and signed the following:—

### MINORITY REPORT.

"We, your committee on constitution, confession of faith, and section 3 of chapter X, would report as fol-

lows: We have deliberately considered the important interests committed to us and have concluded as follows: (1.) The constitution we now have in the discipline, and have had for forty-four years, is the constitution of the Church of the United Brethren in Christ, and every member legally received into the church for years has consented to be governed by the same. It was declared legal also by the general conference of eighteen hundred and forty-nine, and to it our legislation has conformed, and under its direction our officers have been elected and the general conference formed according to its provisions. (2.) This constitution makes no provision for the general conference to alter or change it without first securing the consent of the members of the church by a two thirds vote, as required in article IV of the constitution, and to take any other method would not be legal. (3.) It is our view that this question as to the constitution should be determined before we revise section 3 of chapter X."

A motion was made to adopt the majority report, which, after being discussed that day and all the next, was carried. On the next day the supplemental report, after being slightly amended, was upon motion adopted. On the next day thirty-four members protested against the action of the conference in adopting the report of committee number six, and had their protest spread upon the records of the conference. On the twelfth day of the conference the members of the church commission were chosen, as provided for in the report. This church commission so chosen met at Dayton, Ohio, on the seventeenth day of November, eighteen hundred and eighty-five, and formulated a confession of faith and amended constitution, to be submitted to the members of the church for their approval or disapproval, said revised confession of faith and amended constitution being as follows:—

REVISED CONFESSION OF FAITH.

In the name of God, we declare and confess before all men the following articles of our belief:—

### ARTICLE I.

#### OF GOD AND THE HOLY TRINITY.

We believe in the only true God, the Father, the Son, and the Holy Ghost; that these three are one,—the Father in the Son, the Son in the Father, and the Holy Ghost equal in essence or being with the Father and the Son.

### ARTICLE II.

#### OF CREATION AND PROVIDENCE.

We believe this triune God created the heavens and the earth and all that in them is, visible and invisible; that he sustains, protects, and governs these with gracious regard for the welfare of man to the glory of his name.

### ARTICLE III.

#### OF JESUS CHRIST.

We believe in Jesus Christ; that he is very God and man; that he became incarnate by the power of the Holy Ghost and was born of the Virgin Mary; that he is the Savior and Mediator of the whole human race, if they with full faith accept the grace proffered in Jesus; that this Jesus suffered and died on the cross for us, was buried, rose again on the third day, ascended into heaven, and sitteth on the right hand of God, to intercede for us, and that he will come again at the last day to judge the living and the dead.

### ARTICLE IV.

#### OF THE HOLY GHOST.

We believe in the Holy Ghost; that he is equal in being with the Father and the Son; that he convinces the

world of sin, of righteousness, and of judgment; that he comforts the faithful and guides them into all truth.

### ARTICLE V.

#### OF THE HOLY SCRIPTURES.

We believe that the Holy Bible, Old and New Testaments, is the word of God; that it reveals the only true way to our salvation; that every true Christian is bound to acknowledge and receive it by the help of the spirit of God as the only rule and guide in faith and practice.

### ARTICLE VI.

#### OF THE CHURCH.

We believe in a Holy Christian Church, composed of true believers, in which the word of God is preached by men divinely called, and the ordinances are duly administered; that this divine institution is for the maintenance of worship, for the edification of believers, and the conversion of the world to Christ.

### ARTICLE VII.

#### OF THE SACRAMENTS.

We believe that the sacraments, baptism and the Lord's supper, are to be used in the church, and should be practiced by all Christians; but the mode of baptism and the manner of observing the Lord's supper are always to be left to the judgment and understanding of each individual; also the baptism of children shall be left to the judgment of believing parents. The example of the washing of feet is to be left to the judgment of each one to practice or not.

### ARTICLE VIII.

#### OF DEPRAVITY.

We believe that man has fallen from his original righteousness, and, apart from the grace of our Lord

Jesus Christ, is not only entirely destitute of holiness, but is inclined to evil and only evil, and that continually; and that except a man be born again he cannot see the kingdom of heaven.

### ARTICLE IX.

#### OF JUSTIFICATION.

We believe that penitent sinners are justified before God only by faith in our Lord Jesus Christ, and not by works; and yet that good works in Christ are acceptable to God, and spring out of a living faith.

### ARTICLE X.

#### OF REGENERATION AND ADOPTION.

We believe that regeneration is the renewal of the heart of man after the image of God through the word, by the act of the Holy Ghost, by which the believer receives the spirit of adoption, and is enabled to serve God with the will and the affections.

### ARTICLE XI.

#### OF SANCTIFICATION.

We believe that sanctification is the work of God's grace through the word and spirit, by which those who have been born again are separated in their acts, words, and thoughts from sin, and are enabled to live unto God, and to follow holiness, without which no man shall see the Lord.

### ARTICLE XII.

#### OF THE CHRISTIAN SABBATH.

We believe that the Christian Sabbath is divinely appointed; that it is commemorative of our Lord's resurrection from the grave, and is an emblem of our eternal rest; that it is essential to the welfare of the civil community, and to the permanence and growth of the

Christian church, and that it should be reverently observed as a day of holy rest and of social and public worship.

### ARTICLE XIII.

#### OF THE FUTURE STATE.

We believe in the resurrection of the dead; the future general judgment, and an eternal state of rewards in which the righteous "dwell in endless life, and the wicked in endless punishment."

### AMENDED CONSTITUTION.

In the name of God, we, the members of the Church of the United Brethren in Christ, for the work of the ministry, for the edifying of the body of Christ, for the more speedy and effectual spread of the gospel, and in order to produce and secure uniformity in faith and practice, to define the power and business of the general conference as recognized by this church, and to preserve inviolate the popular will of the membership of the church, do ordain this constitution:—

### ARTICLE I.

Section 1.   All ecclesiastical power herein granted to enact or repeal any rule or rules of discipline is vested in a general conference, which shall consist of elders and laymen elected in each annual conference district throughout the church. The number and ratio of the elders and laymen, and the mode of their election, shall be determined by the general conference; *provided, however,* that such elders shall have stood as elders in the conferences which they are to represent for no less time than three years next preceding the meeting of the general conference to which they are elected, and that such laymen shall be not less than twenty-five years of age,

27 OR.—53.

and shall have been members of the church six years, and members of the conference district which they are to represent at least three years next preceding the meeting of the general conference to which they are elected.

Section 2.  The general conference shall convene every four years, and a majority of the whole number of delegates elected shall constitute a quorum.

Section 3.  The ministerial and lay delegates shall deliberate and vote together as one body; but the general conference shall have power to provide for a vote by separate orders whenever it deems it best to do so, and in such cases the concurrent vote of both orders shall be necessary to complete an action.

Section 4.  The general conference shall at each session elect bishops from among the elders throughout the church who have stood six years in that capacity.

Section 5.  The bishops shall be members *ex officio* and presiding officers of the general conference; but in case no bishop be present, the conference shall choose a president *pro tempore.*

Section 6.  The general conference shall determine the number and boundaries of the annual conferences.

Section 7.  The general conference shall have power to review the records of the annual conferences, and see that the business of the annual conference is done strictly in accordance with the discipline, and approve or annul, as the case may require.

Section 8.  The general conference shall have full control of the United Brethren printing establishment, the home, frontier, and foreign mission society, the church erection society, the general Sabbath-school board, the board of education, and the Union Biblical Seminary.  It shall also have power to establish and manage any other organization or institution within the

church which it may deem helpful in the work of evangelization.

Section 9.   The general conference shall have power to establish a court of appeals.

Section 10.   The general conference may, two thirds of the members elected thereto concurring, propose changes in or additions to the confession of faith; *provided,* that the concurrence of three fourths of the annual conferences shall be necessary to their final ratification.

### ARTICLE II.

The general conference shall have power, as provided in article I, section 1 of this constitution, to make rules and regulations for the church; nevertheless, it shall be subject to the following limitations and restrictions:—

Section 1.   The general conference shall enact no rules or ordinance which will change or destroy the confession of faith, and shall establish no standard of doctrine contrary to the confession of faith.

Section 2.   The general conference shall enact no rule which will destroy the itinerant plan.

Section 3.   The general conference shall enact no rule which will deprive local preachers of their votes in the annual conferences to which they severally belong.

Section 4.   The general conference shall enact no rule which will abolish the right of appeal.

### ARTICLE III.

Section 1.   We declare that all secret combinations which infringe upon the rights of those outside their organization, and whose principles and practices are injurious to the Christian character of their members, are contrary to the word of God, and that Christians ought to have no connection with them.   The general conference shall have power to enact such rules of discipline,

with respect to such combinations, as in its judgment it may deem proper.

Section 2.    We declare that human slavery is a violation of human rights, and contrary to the word of God. It shall therefore in nowise be tolerated among us.

### ARTICLE IV.

The right, title, interest, and claim of all property, both real and personal, of whatever name or description, obtained by purchase or otherwise, by any person or persons, for the use, benefit, and behoof of the Church of the United Brethren in Christ, are hereby fully recognized and held to vest in the church aforesaid.

### ARTICLE V.

Section 1.    Amendments to this constitution may be proposed by any general conference,—two thirds of the members elected thereto concurring,—which amendments shall be submitted to a vote of the membership throughout the church, under regulations authorized by said conference.    A majority of all the votes cast upon any submitted amendment shall be necessary to its final ratification.

Section 2.    The foregoing amended constitution shall be in force from and after the first Monday after the second Tuesday of May, eighteen hundred and eighty-nine, upon official proclamation thereof by the board of bishops; *provided,* that the general conference elected for eighteen hundred and eighty-nine shall be the lawful legislative body under the amended constitution, with full power, until its final adjournment, to enact such rules as this amended constitution authorizes.

The church commission established a plan of submission of the proposed revised confession of faith and amended constitution to a vote of the members of the

church, in which it was provided: (1.) That the confession of faith as a whole should be submitted to a vote of the church, those favoring its adoption to have written or printed upon their ballots the words, "Confession of Faith—Yes"; those opposed to its adoption to have written or printed upon their ballots the words "Confession of Faith—No." (2.) The amended constitution as a whole should be submitted to a vote of the church members, with the following exceptions: Article I, in so far as it related to lay delegation in the general conference, to be voted upon separately; those favoring its adoption to have written or printed on their ballots the words "Lay Delegation—Yes," those opposed, the words "Lay Delegation—No." Also section 1 of article III, to be submitted separately; those favoring its adoption to have written or printed upon their ballots the words "Section on Secret Combinations—Yes"; those opposed, the words "Section on Secret Combinations—No." Those favoring the adoption of the remainder of the constitution were to have written or printed on their ballots the words "Amended Constitution—Yes"; those opposed, the words "Amended Constitution—No." It was further provided that the vote should be taken during the month of November, eighteen hundred and eighty-eight, and that the publishing agent at Dayton, Ohio, should furnish each presiding elder, three months before the time of voting, the necessary number of tickets and return blanks; the presiding elder to distribute them to the pastors in his district, and the pastors to distribute them in proper quantities to their several societies at least ten days before the time of voting. The pastors, leaders, and stewards of each society were constituted a local board of tellers, and it was made their duty on the day of voting to enroll the names of all who voted, and to re-

ceive no votes except those presented in person by the members on the day fixed for voting by the local board of tellers, except that where a member was incapacitated by age or sickness from attending, or a minister be absent on his charge, such persons were permitted to send their ballots with their names signed on the back thereof.   The list of voters was required to be preserved for one year, and it was made the duty of each local board of tellers immediately to make a full report of the vote taken, on a blank provided for this purpose, to its annual conference board of tellers, who were to be elected by each annual conference, at the session next preceding the time of voting; and these annual conference boards of tellers were required to receive the returns from the local boards of tellers in the bounds of the conference, and to count and transmit a full and accurate report of the same on blanks provided to the general board of tellers on or before January first, eighteen hundred and eighty-nine.   Provision was also made in cases where the presiding elders or annual conferences neglected or refused to comply with instructions.   A general board of tellers, consisting of seven persons, was constituted at Dayton, Ohio, whose duty it was to receive the reports from the annual conference boards of tellers, and to count and make a full and accurate report of the same to the board of bishops, not later than the fifteenth day of January, eighteen hundred and eighty-nine.   The board of bishops were directed to prepare a letter addressed to the church on the work of the commission, to be published through the *Religious Telescope,* the official organ of the church, and otherwise, which was done in January, eighteen hundred and eighty-six, and the bishop's address, accompanied by the commission act, plan of submission, and proposed confession of

faith and constitution, were distributed throughout the church immediately thereafter.

During the month of November, eighteen hundred and eighty-eight, the vote was taken in all respects as provided for in said plan of submission, and the votes were counted and canvassed by the several boards of tellers, as therein provided, and the result of the vote was declared by the general board of tellers on the fifteenth day of January, eighteen hundred and eighty-nine, and said result was published in the *Religious Telescope* on the twenty-third of January, eighteen hundred and eighty-nine, the said result being as follows:—

| | |
|---|---|
| For the confession of faith | 51,070 |
| Against the confession of faith | 3,310 |
| Majority for the confession | 47,760 |
| Number required to adopt, 36,245. | |
| For the amended constitution | 50,685 |
| Against the amended constitution | 3,659 |
| Majority for the amended constitution | 47,026 |
| Number required to adopt, 36,230. | |
| For lay delegation | 48,825 |
| Against lay delegation | 5,634 |
| Majority for lay delegation | 43,191 |
| Number required to adopt, 36,306. | |
| For section on secret combinations | 46,994 |
| Against section on secret combinations | 7,298 |
| Majority for section on secret combinations | 39,696 |
| Number required to adopt, 36,194. | |

That the total number of votes cast for and against the several propositions was fifty-four thousand three

hundred and sixty-nine.  The enrolled membership of
the church in eighteen hundred and eighty-eight was
two hundred and four thousand five hundred and seven-
teen, said enrollment being made by the preachers of
the church under a disciplinary law; and at the election
held in November, eighteen hundred and eighty-eight,
throughout the church for delegates to the general con-
ference of eighteen hundred and eighty-nine, at which
election all the members of the church, without regard
to age or sex, were entitled to vote, the total number of
votes cast was fifty-eight thousand eight hundred and
thirty-nine.  The proclamation of the vote as above
stated was agreed upon and signed at Chambersburg,
Pennsylvania, May sixth, eighteen hundred and eighty-
nine, by all the bishops of the church, except one, who
was present but declined to sign; and the same was pub-
lished in the official organs of the church, as required in
the plan of submission adopted by the general confer-
ence.

A general conference of the church, composed of
delegates duly and regularly elected under the laws,
rules and regulations of the church, met at the York
Opera-house, in York, Pennsylvania, on Thursday, May
ninth, eighteen hundred and eighty-nine.  On the second
day of the conference, the church commission which had
been established by the general conference of eighteen
hundred and eighty-five, as above stated, submitted to
the conference a report of the work done by it, in con-
nection with the amended constitution and revised con-
fession of faith, embodying in said report the said consti-
tution and confession of faith, the plan of submission,
and the action and vote of the members of the church
upon the several propositions submitted, as stated above.
This report was submitted to a special committee of
seven, with instructions to report to the conference

whether the commission had acted in compliance with the instructions of the general conference, and whether the vote had been orderly and regular; and also to recommend to the conference such action as might be deemed proper to be taken in the premises. Five members of this committee, on Saturday, May eleventh, eighteen hundred and eighty-nine, submitted to the conference a report commending and approving the work of the commission, and recommending the adoption of the following resolutions: "Resolved by the General Conference of the Church of the United Brethren in Christ, in quadrennial session assembled in the city of York, Pennsylvania, May ninth, eighteen hundred and eighty-nine. (1.) That the recorded proceedings of the commission, including the revised confession of faith and amended constitution, as formulated and submitted to a vote of the church, together with the methods of submission, and all other acts by which the will of the church was ascertained thereon, are hereby approved and confirmed. (2.) That because of the truth that the revised confession of faith and amended constitution as a whole and all the separate propositions thereof submitted to the membership of our church have been adopted by more than the required two thirds of all the votes cast thereon, as required by the general conference of eighteen hundred and eighty-five, it is hereby declared and published by this conference, and for itself, that the said revised confession of faith and amended constitution as framed and submitted by the lawfully constituted commission of the church, are become the fundamental belief and organic law of the Church of the United Brethren in Christ, and will be in full force and effect on and after the thirteenth day of May, A. D., eighteen hundred and eighty-nine, upon the proclamation of the bishops as provided and ordered in said amended constitution." A

72 OR.— 54.

minority report signed by two members of the committee was also submitted to the conference, reciting that the course of the church commission had been irregular in certain particulars therein specified, and suggesting that the general conference submit such amendments of the constitution to the vote of the people as it might deem wise and prudent, which should be regarded as a petition for such proposed changes. The report of the majority of the committee was adopted upon a rollcall by a vote of one hundred and ten for, to twenty against it. On the thirteenth day of May, eighteen hundred and eighty-nine, there was published in the *Religious Telescope* the proclamation of the board of bishops, signed by J. Weaver, J. Dickson, N. Castle, E. B. Kephart, and D. K. Flickinger, duly qualified and acting bishops of the church, publishing and proclaiming the result of the vote of the church in accord with the provisions of the general conference of eighteen hundred and eighty-five, said result being as above set forth, and announcing further that the result of said vote being the required two thirds, they did thereby publish and proclaim the document thus voted to be the confession of faith and constitution of the Church of the United Brethren in Christ.

.   On Monday, May thirteenth, eighteen hundred and eighty-nine, after the proclamation of the board of bishops had been read to the general conference, fifteen of the twenty members who had voted against the adoption of the report of the committee as above stated, and who had, up to this time, been participating in the deliberations of the body, withdrew from the York Opera-house, where the general conference was then being held, and met in a body at the Park Opera-house, in said city of York, and, after organizing, adopted a paper which stated, in substance, that inasmuch as one hundred

and ten of the delegates and members of the general conference did, on May eleventh, eighteen hundred and eighty-nine, vote to adopt a new constitution and confession of faith, and did on the thirteenth day of May, eighteen hundred and eighty-nine, through the presiding bishop, declare the same in force, thereby forming a new church, therefore they were declared to have thereby vacated their seats as members of the general conference of the Church of the United Brethren in Christ. Daily sessions of this body were held until the following Saturday, when it adjourned *sine die.* It transacted business pertaining to the affairs of the church, claimed to be the general conference of the church, and declared its adherence to the old constitution and confession of faith. Those persons composing it, and those acting with them, have since been known and designated as "Radicals."

After the withdrawal of these members, the conference which had been in session at the York Opera-house continued its sessions each day until Tuesday, May twenty-first, when it adjourned *sine die.* It adopted a resolution reciting that,—

Whereas certain delegates (naming them) had actively participated in the proceedings of that body from its organization to the close of its third day's session, and had then vacated their seats, and joined in the formation of another church organization, outside and separate and apart from the place properly and officially occupied by the lawfully elected general conference of the church; therefore,

*Resolved,* That the aforesaid persons were declared as having irregularly withdrawn from that body and the church, and were, in view of these facts, no longer ministers or members of the Church of the United Brethren in Christ.

It also adopted certain rules concerning insubordination of members of the church, and transacted other business pertaining to the church. This body and those acting with it have since been known and designated as "Liberals." Those designated as "Radicals" have, since the general conference of eighteen hundred and eighty-nine, adhered to the old constitution and confession of faith, and rejected the amended constitution and revised confession of faith; those known and designated as "Liberals" accept the revised confession of faith and amended constitution, and have been, since that time, acting thereunder and in conformity therewith. There was a decree for plaintiff sustaining the proceedings of the conference of May, eighteen hundred and eighty-nine, and defendants appeal.        AFFIRMED BY A DIVIDED COURT.

For appellants, (the seceders, or old constitution party,) there were briefs and oral arguments by *Messrs. George H. Williams* and *Lawrence Flinn.*

The constitution of eighteen hundred and forty-one is the organic law of the church. The evidence is conclusive that the church itself has treated this as the fundamental law ever since its adoption. The conference of eighteen hundred and eighty-five clearly took this as the basis on which to work, and proposed to amend this very document. The church itself, by and through its general conference, in its efforts to change and amend the constitution, has given it the force and sanctity of organic law; and the very men who now declare that this is not the constitution, publicly declared at the York conference that they then "passed from under the old constitution to legislate under the amended constitution."

There was no "request" to change the constitution. The constitution of eighteen hundred and forty-one was adopted to limit the power of the general conference, so

that the principles of the church government, as well as the creed and faith, should not be subject to the changing whims of the general conference; and for that purpose there was adopted the provision requiring a "request of two thirds of the whole society" before any change could be made. Now, it is claimed that a "request" means a vote, and that a two thirds vote means two thirds of those voting. The constitution itself does not mention a vote, but it does mention a request. Webster defines a request as "the act of asking for anything desired." All the members of the church desiring a change in the constitution may ask for it, and two thirds of the whole number must ask for it before the change can be granted. By considering the condition of the church at the time the constitution was adopted, the object for which it was made, and the history of the church since its adoption, it seems certain that it means exactly what it says,—that a request or demand of some kind must come from two thirds of the whole society before the constitution can be amended. The word "request" was designedly used, as distinguished from "vote." It appears from the history of the church that the lay members were excluded from any voice in the government. The general conference was composed of elders exclusively, and the annual conferences determined who should be elders, where they should preach, and what salary they should receive. The government was a priestly hierarchy, from the lowest to the highest; and the only power left to the laity was the right of petition,—the right to ask the general conference to change the constitution. The framers of this constitution evidently intended that it should not be changed, for they expressly declared that a change should be made only in a particular way, and made that way very difficult of accomplishment.

Where a law is plain and unambiguous it should be enforced as made. The legislature is presumed to have meant what it said, and there is no room for any construction: *People* v. *Purdy,* 2 Hill, 35; *Greencastle Township* v. *Black,* 5 Ind. 570; *Newell* v. *People,* 7 N. Y. 97; *Leavenworth Railroad Company* v. *United States,* 92 U. S. 751; *State* v. *Doron,* 5 Nev. 410; *Cornwell* v. *Owens,* 14 Md. 215; *People* v. *New York Central Railroad Company,* 34 N. Y. 492; *Smith* v. *Thursly,* 28 Md. 244; *Commonwealth* v. *Swartz,* 66 Pa. St. 134.    From this principle it would seem to follow that the clause of the constitution providing that "there shall be no alteration of the foregoing constitution unless by two thirds of the whole society" means two thirds of all its members — nothing less, nothing more. Not two thirds of those who vote, but two thirds of the whole society. The words used in the constitution have a plain, certain, and definite meaning, which involves no absurdity and no contradiction between different parts of the instrument; if not, then the apparent meaning on the face of the instrument, using the words in their natural and grammatical sense, is the one which the court is bound to say was intended to be conveyed.

Those voting are not to be considered as the whole society. The authorities cited to support the doctrine that two thirds of those voting are two thirds of the whole society are not in point. There appears to be a distinction made as to whether the vote is provided for in the constitution or only by statute. If the former, then the whole number voting at the election are to be counted, whether they vote on the particular matter in question or not. In *State* v. *Durkheimer,* 20 Or. 160, this court discussed the difference between a statutory enactment and a constitutional provision on this subject, and quotes with approval *State* v. *Wurkmeier,* 35 Mo. 103, where it was held that a majority of those voting on a given

subject did not mean a majority of the legal voters.    See also *Jones* v. *Lancaster,* 6 Neb. 474; *State* v. *Sutterfield,* 54 Mo. 391; *Braden* v. *Stumph,* 16 Lea (Tenn.), 581; and *Vance* v. *Austell,* 45 Ark. 400.    All these authorities repudiate the principle that the consent of those not voting is to be presumed where there is a constitutional provision on the vote required, and affirm the contrary doctrine.

The adoption of the new constitution was not a decision of the church tribunal on an ecclesiastical question.    It is claimed by the plaintiff that the change of the constitution and confession of faith was a decision by an ecclesiastical court on an ecclesiastical question, and that the decision making or ratifying the change is final,—is binding upon the civil courts, and cannot be inquired into by them.    On that subject we insist that the necessity or propriety of making a change is an ecclesiastical question, the manner of making it is legislative.    We claim the law to be that when civil or property rights, as contradistinguished from ecclesiastical rights, are involved, and such rights depend upon the religious belief or orthodoxy of citizens, or on the rules, discipline, or practices of religious denominations, the civil courts may hear evidence and judicially determine all such questions, so far as they affect the rights of persons or of religious denominations in property or to civil rights: *Chase* v. *Cheney,* 58 Ill. 540 (10 Am. Law. Reg. (N. S.), 295, with note); *Watson* v. *Avery,* 2 Bush, 363; *Garten* v. *Pemek,* 5 Bush, 110; *Watson* v. *Garvin,* 54 Mo. 377; *Gibson* v. *Armstrong,* 7 B. Mon. 495; *Ferrarier* v. *Vasconcelles,* 23 Ill. 456; *Smith* v. *Nelson,* 18 Vt. 512; *Sutter* v. *Trustees of the First Reformed Dutch Church,* 42 Pa. St. 503; *Hendricksen* v. *Decow,* 1 Sutton (N. J. Eq.), 577.

For respondent (the new constitution party) there were several briefs and oral arguments by *Messrs. Caples,*

*Hurley and Allen, John Burnett, W. S. McFadden, John W. Whalley,* and *Reuben S. Strahan.*

Constitution of eighteen hundred and forty-one was not legal or binding as such. The conference, which in eighteen hundred and forty-one assumed to make an un-alterable law for the church, was composed of twenty-three delegates, all preachers. The membership had neither voice nor vote in this conference, nor opportunity to vote in approval or disapproval of its work. It had sent no petitions, had made no request, and had given no authority to the members of this conference to make an organic law, much less an unalterable law for the church. The word "constitution" is used to designate the written instrument agreed upon by the people of the Union, or of a particular state, as an absolute rule of action and decision for all departments and officers of the government in respect to all the points covered by it, which must control until it shall be changed by the authority which established it: 1 Story on the Constitution, 338; Cooley on Constitutional Limitations, 3; *People* v. *New York Central Railroad Company,* 24 N. Y. 486; *Vanhorn* v. *Dorrance,* 2 Dall. 308. Such a constitution is not operative until it has been adopted by the people: *Parker* v. *Smith,* 3 Minn. 240 (74 Am. Dec. 749); *State* v. *New Orleans,* 29 La. Ann. 863; Cooley on Constitutional Limitations, 32; *Wells* v. *Bain,* 75 Pa. 39 (15 Am. Rep. 563); *Woods's Appeal,* 75 Pa. 59. As to the suggestion that this so-called constitution became valid by universal acquiescence, it is simply absurd. As Mr. Jameson clearly points out in his work on Constitutional Conventions, (page 494,) no constitution ever originated in that. The people obeyed this so-called constitution of eighteen hundred and forty-one, not because it was a constitution, but because it was a law of the legislative body of the church.

The power to enact includes the power to repeal, and any law may be amended or repealed by the same body that enacted it.   This alleged constitution was passed with no greater formality and by no different vote than were all the other laws made by the general conference; why, then, has it any greater force or validity, or why may it not be repealed or modified by another conference?   If it had been submitted to the people of the church and by them ratified, we concede that it could not be changed, except in the way provided by the instrument itself; but in the absence of any ratification, we submit that it has no more force than a statute: *Richardson* v. *Union Congregational Society of Francestown,* 58 N. H. 187; *Commonwealth* v. *Lancaster,* 5 Watts, 152; *Christ Church Wardens* v. *Pope,* 8 Gray, 140; *Bloomer* v. *Stolley,* 5 McLean, 161; *Kellogg* v. *Oshkosh,* 14 Wis. 624; *Brightman* v. *Kirner,* 22 Wis. 55; *Morgan* v. *Smith,* 4 Minn. 104; Angell and Ames on Private Corporations, 459; 3 American and English Encyclopædia of Law, 691; *Wall* v. *State,* 23 Ind. 150; *State* v. *Oskins,* 28 Ind. 364; *Milan and Richland Plank Road Company* v. *Husted,* 3 Ohio St. 581; *Harrison* v. *Doyle,* 24 Ohio St. 301.   The constant exercise of a power by the legislature from the adoption of the constitution to the present time ought to be deemed almost conclusive evidence of its rightful possession by that body: *State* v. *Mayhew,* 2 Gill, 487.

"Request" does not mean an antecedent expressed desire.   That would be absurd.   Just what the twenty-three German preachers who assumed to make this constitution meant by the word "request" is not easy to determine.   The church was then small and confined to rural districts where it was quite easy for the bishops and preachers to know the wishes of their congregations. The proceedings at several conferences indicate that they thought the "request" would be verbal, and that the

27 OR.—55.

delegates to the conferences could determine by an exchange of notes whether the people were for or against a measure. In the present state of the church it is impossible to get any expression of opinion except by some systematic effort. It could not have been intended that there must be a wish expressed as a condition precedent to any amendment being considered, for that would be inconvenient, unjust, and absurd. Every interpretation that leads to an absurdity ought to be rejected: Vattel on Law of Nations, book II, chap. XVII, § 282; Smith on Statutory and Constitutional Law, 695; *Taylor* v. *Taylor,* 10 Minn. 107; Story on the Constitution, 141, 145, 157, 161. What the conference intended was either the mode indicated in several conferences, that, before any change should be made, the conference be satisfied that it was desired by two thirds of the whole society, or the usual and reasonable one found, substantially, in almost all constitutions, to wit, that the constitution be not altered, except by the consent, approval, or vote of two thirds of the whole society. And the history of the church shows that this was the construction put upon it by all the conferences which have been held since. Ordinances of cities have been in many instances declared "invalid because unreasonable and oppressive": *People* v. *Armstrong,* 2 L. R. A. 721 (73 Mich. 288); *Re Frazee,* 63 Mich. 396; *Clinton* v. *Phillips,* 58 Ill. 102 (11 Am. Rep. 52); *Northern Liberties Commissioners* v. *Northern Liberties Gas Company,* 12 Pa. 318; *Kip* v. *Paterson,* 26 N. J. L. 298; *Commonwealth* v. *Robertson,* 5 Cush. 438; *Dunham* v. *Rochester Trustees,* 5 Cowp. 462; Dillon on Municipal Corporations, § 253; *State* v. *Sinks,* 42 Ohio St. 345.

The history of the church shows that this word has always been so construed, and that construction ought to be conclusive on the civil courts. If there be doubt as to the meaning of a constitutional provision, and the

body that made the constitution, although at a subsequent meeting, and when composed of different members, construes it, such construction will be accepted as the true one: Domat's Civil Law, quoted by Smith in his Commentaries on Statutory and Constitutional Law, 619; *Westbrook* v. *Miller,* 56 Mich. 148; *United States* v. *Philbrick,* 120 U. S. 52 (30 L. ed. 559); *Howell* v. *State,* 71 Ga. 224 (51 Am. Rep. 259); *Chestnut* v. *Shane,* 16 Ohio, 599 (47 Am. Dec. 387); *Cronise* v. *Cronise,* 54 Pa. 255; *Atlantic and Gulf Railroad Company* v. *Georgia,* 98 U. S. 359 (25 L. ed. 185); *First National Bank of North Bennington* v. *Bennington,* 16 Blatchf. 53; *Smith* v. *Good,* 34 Fed. 204. There is no mode by which a legislative act can be made irrepealable, except it assume the form and substance of a contract: *Bloomer* v. *Stolley,* 5 McLean, 158; Cooley on Constitutional Limitations, 149; 1 Blackstone's Commentaries, 91.

The total vote will be presumed to be the entire membership. The whole number of votes cast at an election at which an amendment to a state constitution is submitted will be taken as the number of electors of the state, and where an act required a "majority of the legal voters" of a township or county, it "intended to require only a majority of the legal voters of the township or county voting at the election": *St. Joseph Township* v. *Rogers,* 83 U. S. (16 Wall.), 663, 664 (21 L. ed. 338, and authorities there cited); *Christ Church Wardens* v. *Pope,* 8 Gray, 140; *Richardson* v. *Union Congregational Society of Francestown,* 58 N. H. 188; *State* v. *Swift,* 69 Ind. 505; *Constitutional Prohibitory Amendment,* 24 Kan. 700; *Dayton* v. *St. Paul,* 22 Minn. 400; *Miller* v. *English,* 21 N. J. L. 317; *Madison Avenue Baptist Church* v. *Baptist Church in Oliver Street,* 2 Abb. Pr. (N. S.), 254; *Cass County* v. *Johnston,* 95 U. S. 369 (24 L. ed. 417); *Harrison* v. *Hoyle,* 24 Ohio St. 269; *Lamb* v. *Cain,* 14 L. R. A. 518 (129 Ind. 426); *Talbot* v. *Dent,* 9 B. Mon. 526; *State* v. *St. Joseph,* 39 Mo. 270; *People* v. *Wiant,* 48 Ill. 263.

A majority of those voting shall be considered a majority of the whole number: *People* v. *Warfield,* 20 Ill. 160; *People* v. *Garner,* 47 Ill. 246; *Melvin* v. *Lisenby,* 72 Ill. 65 (22 Am. Rep. 141); *Louisville and Nashville Railroad Company* v. *Davidson County Court,* 1 Sneed, 637 (62 Am. Dec. 424); *State* v. *Swift,* 69 Ind. 505; *Taylor* v. *Taylor,* 10 Minn. 107; Mc-Crary on Elections, § 173; *Lamb* v. *Cain,* 14 L. R. A. 518 (129 Ind. 486); *Carroll County Supervisors* v. *Smith,* 111 U. S. 556 (28 L. ed. 517); *Connitt* v. *Reformed Protestant Dutch Church of New Prospect,* 54 N. Y. 551; *Walker* v. *Oswald,* 68 Md. 146; *Green* v. *Weller,* 32 Miss. 650; *Constitutional Prohibitory Amendment,* 24 Kan. 700; *Dayton* v. *St. Paul,* 22 Minn. 400; *Miller* v. *English,* 21 N. J. L. 317; *Madison Avenue Baptist Church* v. *Baptist Church in Oliver Street,* 2 Abb. Pr. (N. S.), 254; *Bridgeport* v. *Housatonic Railroad Company,* 15 Conn. 475; *State* v. *Lancaster County Commissioners,* 6 Neb. 474.

Action of the general conference is conclusive as a decision by a church tribunal on an ecclesiastical question. The general conference of the United Brethren Church has not only considered and judicially determined all the questions herein presented, but in its legislative capacity has approved and sanctioned the work of its commission and adopted the constitution and confession, and as the chief executive power of the church declared them to be the supreme law and the approved doctrine of the church, this is final and conclusive: *Watson* v. *Jones,* 80 U. S. (13 Wall.), 679–733 (20 L. ed. 666–678); *Harrison* v. *Hoyle,* 24 Ohio St. 294; *Gaff* v. *Greer,* 88 Ind. 122 (45 Am. Rep. 449); 2 Potter on Corporations, 709, 719, 720; *Walker* v. *Wainwright,* 16 Barb. 486; *State* v. *Farris,* 45 Mo. 183; *Robertson* v. *Bullions,* 9 Barb. 64; *German Reformed Church* v. *Commonwealth,* 3 Pa. 282; *Gibson* v. *Armstrong,* 7 B. Mon. 481; *Hale* v. *Everett,* 53 N. H. 9 (16 Am. Rep. 82); *Ferraria* v. *Vasconcelles,* 23 Ill. 456; *McGinnis* v. *Watson,* 41 Pa. 9; *Chase* v. *Cheney,* 58 Ill. 509 (11 Am. Rep. 95); *Dwenger* v.

*Geary,* 113 Ind. 106; *Grimes* v. *Harmon,* 35 Ind. 198 (9 Am.
Rep. 690); *Connitt* v. *Reformed Protestant Dutch Church of New
Prospect,* 54 N. Y. 551; *O'Donovan* v. *Chatard,* 97 Ind. 421 (49
Am. Rep. 462); *White Lick Quarterly Meeting of Friends* v.
*White Lick Quarterly Meeting of Friends,* 89 Ind. 136; 1 High
on Injunctions, §§ 310, 314.

When a religious body becomes divided, and the right
to the property is in conflict, the civil courts will con-
sider and determine which of the divisions submits to the
church, local and general.   In determining which of the
divisions has maintained the correct doctrine, the finding
of the supreme ecclesiastical tribunal of the denomina-
tion in question is binding upon the civil courts: *McGinnis*
v. *Watson,* 41 Pa. 9; *Ramsey's Appeal,* 88 Pa. 60; *First Presby-
terian Society of Gallipolis Township* v. *First Presbyterian Society
of Gallipolis Tswnship,* 25 Ohio St. 128; 3 American and Eng-
lish Encyclopædia of Law, 135.

Members who secede from a church organization
thereby forfeit all right to any part of the church
property: *Wiswell* v. *First Congregational Church of Cincinnati,*
14 Ohio St. 32; *Methodist Episcopal Church of Cincinnati* v. *Wood,*
5 Ohio, 283, Wright (Ohio), 12; *McGinnis* v. *Watson,* 41 Pa.
9; *Den* v. *Bolton,* 12 N. J. L. 236; *Associate Reformed Church
Trustees in Newburgh* v. *Theological Seminary of Princeton Trus-
tees,* 4 N. J. Eq. 77; *Miller* v. *Gable,* 2 Denio, 492; *Attorney-
General* v. *Pearson,* 3 Meriv. 355; *Watkins* v. *Wilcox,* 66 N. Y.
654; *Happy* v. *Morton,* 33 Ill. 398; *Fadness* v. *Braunborg,* 73
Wis. 257; *Lawson* v. *Kolbenson,* 61 Ill. 405.

The decision of the general conference on the con-
struction of the constitution is judicial and not legisla-
tive: *Lamb* v. *Cain,* 14 L. R. A. 518 (129 Ind. 486); *Schlichter*
v. *Keiter,* 22 L. R. A. 161 (156 Pa. St. 119); *Russie* v. *Braz-
zell,* 30 S. W. 526; *Schweiker* v. *Husser,* 146 Ill. 399; *Common-
wealth* v. *Green,* 4 Whart. 531; *Watson* v. *Jones,* 80 U. S. (13
Wall.), 679; *Bouldin* v. *Alexander,* 82 U. S. (15 Wall. 131, 21

L. ed. 69); *Gaff* v. *Greer*, 88 Ind. 123 (45 Am. Rep. 449); *White Lick Quarterly Meeting of Friends* v. *White Lick Quarterly Meeting of Friends,* 89 Ind. 136; *Grimes* v. *Harmon,* 35 Ind. 198 (9 Am. Rep. 690); *O'Donovan* v. *Chatard,* 97 Ind. 421 (49 Am. Rep. 462); *Earle* v. *Wood,* 8 Cush. 456; *Connitt* v. *Reformed Protestant Dutch Church of New Prospect,* 54 N. Y. 551; *German Reformed Church* v. *Commonwealth,* 3 Pa. 282; *Shannon* v. *Frost,* 3 B. Mon. 253; *Gibson* v. *Armstrong,* 7 B. Mon. 481; *Hale* v. *Everett,* 53 N. H. 9 (16 Am. Rep. 82); *Ferraria* v. *Vasconcelles,* 23 Ill. 456; *Harmon* v. *Dreher,* 1 Spear's Eq. 87; *McGinnis* v. *Watson,* 41 Pa. 1; *Chase* v. *Cheney,* 58 Ill. 509 (11 Am. Rep. 95); *East Norway Lake Norwegian Evangelical Lutheran Church Trustees* v. *Halvorson,* 42 Minn. 503; *First Constitutional Presbyterian Church of Iowa City* v. *Congregational Society of Iowa City,* 23 Iowa, 567; *Harrison* v. *Hoyle,* 24 Ohio St. 264; *Mannix* v. *Purcell,* 2 L. R. A. 753 (46 Ohio St. 102); *Walker* v. *Wainwright,* 16 Barb. 486; *State* v. *Farris,* 45 Mo. 183; *Robertson* v. *Bullions,* 9 Barb. 64; *Deaderick* v. *Lampson,* 11 Heiskell, 535; 1 High on Injunctions, §§ 310, 314; 3 American and English Encyclopædia of Law, 135; 2 Potter on Corporations, 710, 711; *Den* v. *Bolton,* 12 N. J. L. 236.

The fourteen seceding members were not a quorum, and had no authority to organize a conference. We maintain that these fourteen delegates, having joined the conference and participated in all its proceedings and in the debates on these amendments, had no right to withdraw and proceed to organize another conference. "The right of every legislative assembly, after it is regularly constituted," says Cushing, "to have the attendance of all its members, except those who are absent on leave, is one of its most undoubted privileges. If the rule is adopted that any number of the members of a legislative body can withdraw and thereby destroy its organization and existence, then all that any faction of such bodies would have to do to block the wheels of legislation to

which they were unfriendly, and to destroy even the organization of the body, is to withdraw therefrom." Such a proposition is too foolish and absurd to entertain for a moment. As well might any faction of our state legislature, who did not approve of certain actions and measures, withdraw and proceed to form a legislature of their own and enact laws for the government of the people as for these fourteen members to withdraw from this conference and to proceed to enact laws and rules and regulations for the control and government of this church. If that is the law, why was not the Confederate congress at Montgomery, composed of those who withdrew from congress at Washington in eighteen hundred and sixtyone, the lawful congress of the United States? And why did not that body remaining at Washington cease to exist from that time? The time and place of the meeting of the conference of eighteen hundred and eighty-nine was previously fixed, and the conference proceeded to assemble at that time and place. "And, therefore," says Mr. Cushing, "no valid meeting could be held, or business transacted, at any other place." These fourteen members undertook to hold their so-called conference at another place and at another time than that appointed by law, and consequently all their acts were void: McCrary on Elections (3d ed.), § 592; *Kerr* v. *Teego,* 47 Pa. St. 292; Cushing on Law of Legislative Assemblies, 345.

Suppose the directors of one of our great corporations convene for the purpose of changing their laws, and a fraction less than a quorum should be opposed to a change on constitutional grounds, and after debating for days over the matter, a vote was taken resulting in a majority for the change, will any one contend for a moment that two out of these nine directors who opposed the change could withdraw, and proceed to organize a directors' meeting and enact bylaws or meas-

ures that would bind the company or its stockholders, or deprive them of the use and control of its millions of property, or that by such withdrawal the seven remaining directors ceased to be directors of the company, or a quorum to do business?

The legislature of Oregon is in session. The question of certain amendments to the constitution is before that body. One faction contends that the manner and mode of accomplishing the amendments is according to law, and the other is contending that it is in violation of the law and the very constitution to be amended. After long and angry debate a vote is taken, resulting in a vote of one hundred and seventeen in favor of the amendments and only seventeen against it, and therefore the amendment was declared a law. Will any one contend before this court that the fourteen members opposing the amendments could withdraw and proceed to form another legislature at some other place than at the state house, and proceed to enact laws and make appointments that would bind the people of Oregon? Or will any one claim that by the withdrawal of these seventeen members the former legislature *ipso facto* ceased to exist, and that all its acts became void? Yet that conclusion must be reached before it can be held that these fourteen seceding members constituted the only legal conference of the church, and that the others ceased to be members of the church, and not entitled to the use of the church property.

The attempted change in the constitution, even if void, will not work a forfeiture of church property or loss of membership. We earnestly contend that nothing but a radical change in the confession of faith, doctrines, and principles, will have the effect of depriving these members of the use of the church or school property,

or work a forfeiture of their membership in the church. An attempted amendment of the constitution and change of laws, although void, will not do this. Before the regular organization of the church can lose control of its property, such changes must take place in its organization or teachings as will practically destroy its identity: *Happy* v. *Morton,* 33 Ill. 398; *Lawson* v. *Kolbenson,* 61 Ill. 405; *Miller* v. *Gable,* 2 Denio, 492; *Watkins* v. *Wilcox,* 66 N. Y. 654; *McGinnis* v. *Watson,* 41 Pa. 9; *Ramsey's Appeal,* 88 Pa. 61; *First Presbyterian Church of Louisville* v. *Wilson,* 14 Bush, 252; *Lutheran Congregation of Pine Hill Trustees* v. *St. Michael's Evangelical Church of Pine Hill,* 48 Pa. 20; *Lamb* v. *Cain,* 14 L. R. A. 518 (129 Ind. 486); *Watson* v. *Jones,* 80 U. S. (13 Wall.), 679 (20 L. ed. 666); *Gaff* v. *Greer,* 88 Ind. 122 (45 Am. Rep. 449); *White Lick Quarterly Meeting of Friends* v. *White Lick Quarterly Meeting of Friends,* 89 Ind. 136; *Connitt* v. *Reformed Protestant Dutch Church of New Prospect,* 54 N. Y. 551; *Chase* v. *Cheney,* 58 Ill. 540 (11 Am. Rep. 95); *Wiswell* v. *First Congregational Church of Cincinnati,* 14 Ohio St. 32; *Methodist Episcopal Church of Cincinnati* v. *Wood,* 5 Ohio, 283; *Den* v. *Bolton,* 12 N. J. L. 236; *Associate Reformed Church in Newburgh* v. *Theological Seminary of Princeton Trustees,* 4 N. J. Eq. 77.

[31 Pac. 206 ; 26 L. R. A. 68.]

Opinion of MR. JUSTICE MOORE.

The plaintiff relies mainly upon three points to sustain the decree of the court below: *First,* that because the constitution of eighteen hundred and forty-one had never been submitted to or adopted by any vote of the membership of the church, it was not the unalterable law of the church; *second,* that the amendment of the constitution and the revision of the confession of faith were regularly made and legally adopted; *third,* that the revision of the confession of faith did not materially alter, change,

27 OR.—57.

or modify any principle or doctrine in which the church believed, and did not add anything to or take anything from the creed of the church.

1.    The Church of the United Brethren in Christ is a voluntary, unincorporated religious society. "The validity and binding effect of the constitution or a bylaw or other proceeding of a voluntary association, as respects its members, rests upon assent, actual or implied. The relation between the members of such associations is one of contract, and the articles of association and bylaws constitute the terms of the agreement": *Protchett* v. *Schaeffer,* 11 Phila. 166. "The members having agreed to these terms, are bound by them, if they do not conflict with law or public policy": *Hyde* v. *Woods,* 2 Sawy. 655. "Individuals who form themselves together into a voluntary association for a common object, agree to be governed by such rules as they think proper to adopt, if there is nothing in them in conflict with the law of the land; and those who become members of the body are presumed to know them, to have assented to them, and they are bound by them": *Innes* v. *Wylie,* 1 Car. and K. 260. The members who have joined this church since May, eighteen hundred and forty-one, are presumed to know the contents of the constitution of that year, have assented thereto, and are bound thereby. To them it is as binding as if the constitution had been submitted to and voted upon at an election duly called for that purpose. They were not bound by its provisions till they became members of the church. The constitution is a part of the contract to which they assented; it is the bond of union between them and the church. There has been a personal assent on their part to its provisions, and to them it is the constitution of the church. The members who had joined prior to May, eighteen hundred and forty-one, by remaining therein, are bound by the constitution of that year; they have by

their acts personally assented to its provisions. "If a member wishes to dissent from a rule lawfully adopted, and to escape being bound by it, he must procure its repeal or withdraw from the society. If, knowing what the rule is, he remains in the society, he is bound, however loudly he may protest against such rule": *White* v. *Brownell*, 2 Daly, 329. No effort was made to amend or repeal the constitution till eighteen hundred and eighty-five. Prior to that year all members of the church had assented to the provisions of the constitution of eighteen hundred and forty-one.

2. The opinion of the church and general conferences from eighteen hundred and forty-one to eighteen hundred and eighty-nine is entitled to much weight in determining the character of this instrument. The general conference of eighteen hundred and thirty-seven framed a constitution, and, doubting its ability to adopt such, ordered its secretary to issue a circular to the members of the church notifying them that at the next general conference a memorial would be presented praying the ratification of the constitution thus framed. The circular was published in the discipline of that year, and distributed among the members of the church. Eminating, as it did, from the highest legislative and ecclesiastical body of the church, the members must have taken notice of it. The next general conference met in Ohio, May tenth, eighteen hundred and forty-one. It did not ratify the constitution adopted by the preceding conference, but adopted another, changing in some particulars the one so framed in eighteen hundred and thirty-seven. The delegates to this general conference were, by the vote of the members, empowered to ratify or reject the constitution of eighteen hundred and thirty-seven. They had met in constitutional convention, were empowered with more than legislative functions, had come directly

from the people comprising the church, knew their wants, represented the members in their sovereign capacity, and, as such constitutional and conventional delegates, adopted the constitution of eighteen hundred and forty-one. It would be too narrow a construction to say that they had no delegated power to frame and adopt a different constitution from that of eighteen hundred and thirty-seven, or to amend the one so framed.

3. The members of the church have in all their legislation recognized the constitution of eighteen hundred and forty-one as the organic law of the church. The general conference of eighteen hundred and eighty-five adopted the report of committee number six, which says: "It is the sense and belief of your committee that the constitution as it stands is not in harmony with the present wishes of our people." And again: "Whereas it is desirable and needful to so amend and improve our present constitution as to adapt its provisions more fully to the wants and conditions of the church in this and future time; therefore, *resolved,* that a commission be appointed," etc. The general conference at York, Pennsylvania, in eighteen hundred and eighty-nine, declared that they passed from under the old, and legislated under the amended, constitution. The written instrument adopted by the church in eighteen hundred and forty-one as its constitution has been treated as its fundamental organic law and constitution by the church and by its general conference from the time of its adoption until eighteen hundred and eighty-nine. It was published every four years in the discipline of the church as its organic law and constitution. The constitution of eighteen hundred and forty-one is now more than twenty years old, has been acted upon as genuine by persons having an interest in the question, and, under the rules of evidence of this state, must be

held to be genuine: 1 Hill's Code, p. 587.*   Hence we conclude the constitution of eighteen hundred and forty-one was what it purported to be, the organic law and constitution of the church.

4.   Were the amendment of the constitution and the revision of the confession of faith regularly made and legally adopted?   Article IV of the constitution of eighteen hundred and forty-one provided that "There shall be no alteration of the foregoing constitution unless by request of two thirds of the whole society."   This constitution contained the foregoing negative clause, but did not provide whether the amendment should be made by the general conference or by a convention duly called for that purpose.   "There are two methods of effecting amendments thus far devised: *First,* that by the agency of conventions; and, *second,* that by the agency of our general assemblies, without conventions, both regularly followed by a ratification by the people": Jameson on Constitutional Conventions, § 530.   In *Collier* v. *Frierson,* 24 Ala. 109, GOLDTHWAIT, J., says: "We entertain no doubt that to change the constitution in any other mode than by a convention, every requisition which is demanded by the instrument itself must be observed, and the omission of any one is fatal to the amendment.   We scarcely deem any argument is necessary to enforce this proposition."   This opinion was sustained in *State ex rel. Hudd* v. *Timme,* 54 Wis. 318, and in *Koehler* v. *Hill,* 60 Iowa, 543.   In each of these states the constitution provided both methods of amendment.   Each state chose the legislative method in attempting an amendment, and the

* The Code provision, section 776, subdivision 35, Hill's Code, here referred to is as follows: "All other presumptions are satisfactory, unless overcome. They are denominated disputable presumptions, and may be controverted by other evidence. The following are of that kind  *  *  *: 35. That a document or writing more than twenty years old is genuine, when the same has been generally acted upon as genuine by persons having an interest in the question, and its custody has been satisfactorily explained."—REPORTER.

courts held in each instance that when the legislative method was adopted, every prerequisite must be faithfully observed. The same rule applies to voluntary associations: *Hochreiter's Appeal,* 93 Pa. St. 479. The general conference of eighteen hundred and eighty-five did not call a constitutional convention. It appointed a commission to frame an amended constitution and a revised confession of faith. The commissioners were agents of the general conference, and their acts, within the scope of their authority, were the acts of the general conference of that year. The method adopted, then, was by the agency of the general conference without a convention, and its acts, to be legal, must comply with all the requirements of the constitution. Before the general conference could have acquired jurisdiction to amend the constitution, in the manner adopted, there must have been a request of two thirds of the whole society. A "request" is defined by Webster to be "the act of asking for anything desired." All the members of the church desiring a change in the constitution may ask for it, and two thirds of the whole society must ask for it before the change can be granted. The constitution is silent as to the time and manner of making the request. It does not provide that it shall be by petition or other act by the members of the society, nor by their duly elected delegates to the general conference when in session. The interpretation of this clause of the constitution must be determined by the general conference. It is true the question was not one of faith and discipline, but it was the interpretation of ecclesiastical law, the highest law by which the church was governed, its constitution. Section 1 of article IV of the constitution of eighteen hundred and thirty-seven provided that "If, at any time after passing of this constitution, it should be contemplated either to alter or to amend the same, it shall be

the privilege of any member in society to publish such contemplation at least three months before the election of delegates to the general conference." The general conference of eighteen hundred and forty-one, no doubt realizing the many alterations and amendments which would probably be suggested under the foregoing section, changed the same so as to make it necessary for two thirds of the whole society to request a change before it could be granted. It would seem, then, that the general conference of eighteen hundred and forty-one intended the word "request" to mean just what it purported, and that this request must precede any action looking to a change in the constitution.

5.   Was any such request made to the general conference of eighteen hundred and eighty-five? The general conference of that year was composed of one hundred and seventeen members and five bishops. Assuming that each delegate represented an equal number of the members of the church, and also assuming that the vote upon the report of committee number six was a request to the general conference, we find that four bishops and seventy-four delegates voted for, one bishop and forty-one delegates against, the proposition. This would not be the necessary two thirds of the whole society. The number of members reported to the general conference of eighteen hundred and eighty-five was one hundred and sixty-six thousand three hundred and twenty-three. If it could be said that the delegates to this conference were authorized to make the request for the members of the church, and the vote upon the said report could be taken as the request of the number of persons represented by each delegate, the following number of members from the several conferences could then be counted as requesting an amendment to the constitution: Allegheny, seven thousand three hundred and sixty-five; Ar-

kansas Valley, one thousand five hundred and thirty-six; Central Ohio, three thousand nine hundred and sixty-one; East German, five thousand three hundred and sixty-five; Illinois, two thousand four hundred and forty; Iowa, two thousand two hundred and eighty; Minnesota, nine hundred and ninety-six; Osage, one thousand eight hundred and fifty-nine; Parkersburg, seven thousand eight hundred and eighty-two; Pennsylvania, thirteen thousand two hundred and forty-six; Sandusky, six thousand nine hundred and seventy-seven; Sciota, six thousand four hundred and forty-three; Southwest Missouri, seven hundred and ninety; Upper Wabash, five thousand four hundred and sixty-nine; West Kansas, one thousand three hundred and sixty-three; West Nebraska, eight hundred and twenty-nine. The following conferences, by their delegates, cast a fractional vote in favor of the said report, and that fraction of the membership is equal to the following: California, three hundred and seventy-nine; Dakota, two hundred and twenty-three; East Des Moines, eight hundred and sixty-nine; East Nebraska, nine hundred and ninety-six; Elkhorn, two hundred and forty-eight; Erie, two thousand one hundred and seventy; Fox River, one hundred and fifty-eight; Indiana, one thousand nine hundred and seventy-four; Kansas, one thousand two hundred and fifty-nine; Lower Wabash, three thousand six hundred and eighty-two; Muskingum, two thousand nine hundred and fifty; Ohio, German, nine hundred and· sixty-three; St. Joseph, five thousand two hundred and fifty-eight; Tennessee, four hundred and eighty-eight; Virginia, two thousand two hundred and forty-three; West Des Moines, two thousand one hundred and twenty-two; and Western Reserve, one thousand nine hundred and sixty-five, making a total of one hundred and four thousand one hundred and sixty, and then lacking six thousand seven hundred and twenty-two of the

necessary two thirds of the whole society. Based upon the last method, it is also true that one third of the whole society did not vote against the report of the said committee.

6. Plaintiff claims that the votes had upon the adoption of the amended constitution is a "request." When the general conference of eighteen hundred and eighty-five adopted the report of committee number six, it considered the finding of that committee, "that the general conference has a right to institute measures looking to the amendment, modification, or change of the constitution at any time when it is believed that a majority of our people favor a modification thereof," to be the law of the case, and that it precluded the necessity of any request at all. That general conference believed that a majority of the members of the church favored an amendment of the constitution, and therefore appointed the commission to prepare the proposed amendments. One of the resolutions found in the report of committee number six contained the following: "That when, according to the foregoing provisions, the result of the vote of the church shows that two thirds of all the votes cast have been given in approval of the proposed confession of faith and constitution, it shall be the duty of the bishops to publish and proclaim said result through the official organs of the church. Whereupon the confession of faith and constitution thus ratified and adopted shall become the fundamental belief and organic law of this church." It will appear from the foregoing that the vote of the members was upon approval of the proposed amendments, and was not a "request" to the general conference of eighteen hundred and eighty-nine for their adoption. It became the duty of the bishops to make the proclamation and publish the same when the result showed that two thirds

27 OR.—58.

of all the votes cast had been given in approval of the proposed amendments. The requirement was for the bishops to perform a purely ministerial act. It was the intention of the general conference of eighteen hundred and eighty-five that the amended constitution should be brought into existence by the vote of the members of the church. It was to be their act that should give it life, their vote that should give it birth. It then became the duty of the bishops to declare the result of the vote; to issue the certificate of election; to name the offspring of the constitution of eighteen hundred and forty-one.

What, then, remained for the general conference of eighteen hundred and eighty-nine to do in the matter? It appeared from the returns of the canvassing board that more than two thirds of all the votes polled had been cast in favor of the proposed amendments. What more was required than the proclamation of the bishops? The commission, without any authority whatever from the general conference, and in violation of the express pro- visions of their warrant, changed the time, and provided that the amended constitution should be in force from and after the first Monday after the second Thursday of May, eighteen hundred and eighty-nine, upon official proclamation thereof by the board of bishops, thus at- tempting to render any proclamation of the bishops, prior to that date, unnecessary. On the tenth day of May, eighteen hundred and eighty-nine, the commis- sioners who were appointed by the general conference of eighteen hundred and eighty-five, made a report to the general conference of their proceedings under their ap- pointment, which was, upon motion, referred to a special committee of seven members. Five members of this special committee on the next day made a report to the conference, in which it was resolved, among other things,

"That the recorded proceedings of the commission, including the revised confession of faith and amended constitution, as formulated and submitted to the vote of the church, together with the methods of submission and all other acts by which the will of the church was ascertained thereon, are hereby approved and confirmed"; "that it is hereby published and declared by this conference, for itself, that the said revised confession of faith and amended constitution, as framed and submitted by the lawfully constituted commission of the church, are become the fundamental belief and organic law of the Church of the United Brethren in Christ, and will be in full force and effect on and after the thirteenth day of May, in the year of our Lord, one thousand eight hundred and eighty-nine, upon the proclamation of the bishops, as provided and ordered in said amended constitution." This report was, upon motion, adopted by the general conference, and the board of bishops, on the thirteenth day of May, eighteen hundred and eighty-nine, issued the proclamation.

7.   Plaintiff further claims that the number of votes cast for and against the measure are to be presumed to be the whole number of members of the church, and in support of this proposition cites McCrary on Elections, § 183: "Where a statute requires a question to be decided, or an officer to be chosen, by the votes of 'a majority of the voters of a county,' this does not require that a majority of all persons in the county entitled to vote shall actually vote affirmatively, but only that the result shall be decided by the majority of votes cast; *provided, always,* that there is a fair election and an equal opportunity for all to participate.   In such a case, the only proper test of the number of persons entitled to vote is the result of the election as determined by the ballot-box, and the courts will not go outside of that to inquire

whether there were other persons entitled to vote who would not do so. The 'voters of a county,' referred to by all such statutes, are necessarily the voters who vote at the election, since the result in each case must be by a count of the ballots cast. This doctrine is well settled by authorities." This rule, however, can apply only to elections authorized by law. If the general conference of eighteen hundred and eighty-five had no authority to call the election, then the rule does not apply to this case; and, assuming the vote to have been a request, nothing short of a vote of two thirds of the whole society could have given the general conference of eighteen hundred and eighty-nine any jurisdiction in the matter. If the election was not authorized by law, then it was merely voluntary, and no member opposed to the amended constitution and revised confession of faith need vote upon the question, as only votes cast in favor of the proposition could be counted, and then of no effect unless two thirds of the whole society, as reported to the general conference, voted in favor of the measure. "It is only when an election is authorized by law that the electors, who represent the state or whole people, are bound to attend, and, if they do not, can be bound by the expression of those who do attend": *Wells* v. *Bain,* 75 Pa. St. 47 (15 Am. Rep. 563). In *Braden* v. *Stumph,* 16 Lea (Tenn.), 581, it was held, upon a bill filed in chancery, that "the fact that two thirds of the qualified voters did consent by voting may be shown by proof." This question grew out of the following constitutional provision: "No part of a county shall be taken off to form a new county, or part thereof, without the consent of two thirds of the qualified voters in such part taken off." It was further held that the word "consent," as used therein, means "the active concurrence of the voters, and not a passive acquiescence," and that "two thirds of the qualified voters must

actually vote for the change." There appears to be a distinction made as to whether the vote is provided for in the constitution or only by statute. If the former, then the whole number voting at the election are to be counted, whether they vote upon the particular matter in question or not; but, on the other hand, it appears to be equally well settled that when a vote is taken under a statutory enactment, without a constitutional provision, the consent of those not voting will be presumed: *State ex rel.* v. *Grace,* 20 Or. 160. The most that can be claimed for a constitutional amendment, under an election authorized by law, is that it would be impracticable to determine the number of voters in any other way than by taking the number actually voting as *prima facie* evidence of that fact: *People* v. *Garner,* 47 Ill. 246. The evidence shows that the enrolled membership of the church in eighteen hundred and eighty-eight, at the time the vote was taken upon the adoption of the amended constitution, was two hundred and four thousand five hundred and seventeen; this enrollment having been made by the preachers of the church under a disciplinary law, and reported to the general conference.

8. It is doubtless true that the constitution of eighteen hundred and forty-one was a limitation and not a grant of power, and, since the calling of an election by the general conference was not prohibited, did it have the power to call such an election when the constitution provided that no alteration should be made except upon the request of two thirds of the whole society? In other words, was it an election authorized by law? Could the general conference do by indirection what it could not do directly? One of the rules of construction of constitutions is "that when the constitution defines the circumstances under which a right may be exercised or a penalty imposed, the specification is an implied prohibition

against legislative interference to add to the condition, or to extend the penalty to other cases": Cooley on Constitutional Limitations (5th ed.), 78. The constitution of eighteen hundred and forty-one defined the circumstances under which it might be changed, viz., upon the request of two thirds of the whole society. This specification, then, was an implied prohibition against the general conference adding to or substracting from the conditions. The general conference, doubtless, could have called a legal election upon every question except such as was directly or by implication prohibited in the constitution. The calling of an election to vote upon the amended constitution, when two thirds of the whole society requested the same, was impliedly granted. It is true it was not directly prohibited from calling such an election without this request, but it was impliedly pro· hibited from doing so. Such an election would not be authorized by law.

9. It follows from the foregoing that the election was not authorized by law because no request had been made therefor, and the vote at such election was voluntary; that said vote was not a "request" to the general conference of eighteen hundred and eighty-nine, because two thirds of the whole society had not joined therein, and because the vote was had upon the adoption of the amended constitution, and not for the purpose of making a request; and that the "request" demanded in the constitution means an active concurrence of the members, and not a passive acquiescence.

10. Plaintiff claims that the general conference is the highest judicature of the church, and that its conclusion upon the adoption of the report of the special committee in eighteen hundred and eighty-nine was clearly an ecclesiastical question within its jurisdiction, and therefore binding upon the civil courts. That the general confer-

ence of this church is the highest judicature therein, we think there can be but little question. In speaking of those religious societies that exercise supreme judicature over the members of the church, Mr. Justice MILLER, in *Watson* v. *Jones,* 80 U. S. (13 Wall.), 679, says: "In this class of cases we think the rule of action which should govern civil courts, founded in a broad and sound view of the relation of church and state under our system of laws, and supported by a preponderating weight of judicial authority, is that whenever questions of discipline, or of faith, or of ecclesiastical rule, custom, or law have been decided by the highest of these church judicatures to which the matter has been carried, the legal tribunals must accept such decision as final, and as binding on them in their application to the case before them." In *Shannon* v. *Frost,* 3 B. Mon. 253, the court of Kentucky says: "This court, having no ecclesiastical jurisdiction, cannot revise or question ordinary acts of church discipline or excision. Our only judicial power in the case arises from the conflicting claims of the parties to the church property and the use of it. And this we must decide as we do all other controversies brought to this tribunal for ultimate decision. We cannot decide who ought to be members of the church, nor whether the excommunicated have been justly or unjustly, regularly or irregularly, cut off from the body of this church." This was a case where the society of an independent Baptist Church, by a majority vote, expelled certain members without trial or hearing. The court further says: "They were expelled for alleged nonconformity, and contumacy adjudged against them, without a formal trial or hearing, by a dominant majority as fallible, perhaps, as themselves; self-doomed to the uncontrolled will of a majority of a church selected by themselves, they can obtain no redress in this forum. If their sentence be un-

just, the only appeal is to the omniscient judge of all."
The case of *Chase* v. *Cheney,* 58 Ill. 509, (11 Am. Rep. 95,)
was a suit brought by the defendant to enjoin the plain-
tiffs from proceeding to try him for entertaining views
not in conformity with the doctrine of his church.   The
court in this case says: "This case may be briefly
summed up.   A rector in the church is charged with
nonconformity to its doctrines,—intentional omissions
in the ministration of its ordinances,—and the attempt
is made to organize a court, composed of his brother
clergymen, for his trial.   He appeals to the civil court,
and alleges as the chief reason for interposition the want
of authority in the special court to try him, and a mis-
construction of the canons.   The same point was made
to that court and its power denied.   It was urged with
the same earnestness and enforced with the same argu-
ments there as here.   The court overruled the objections,
and decided it had jurisdiction.   Five intelligent clergy-
men in the church, presumed to be deeply versed in bib-
lical and canonical lore, were more competent than this
court to decide the peculiar question raised.   Why should
we review that and not every other decision which in-
volves the interpretation of the canons?   It is conceded
that when jurisdiction attaches the judgment of the
church court is conclusive as to purely ecclesiastical of-
fenses.   It would be equally conclusive upon doubtful
and technical questions, involving a criticism of the can-
ons, even though they might comprise jurisdictional
facts."   In *Robertson* v. *Bullions,* 9 Barb. 64, the court held
that it was bound by the action of the synod, and would
not decide whether the minister had been rightfully de-
posed or not.

The case of *State* v. *Farris,* 45 Mo. 183, was a *quo war-
ranto* proceeding to test the legality of the election of a
trustee.   The charter of a college provided that vacan-

cies in the board of trustees should be filled by the presbytery, which was, "in connection with the general assembly of the Presbyterian Church in the United States of America, styled 'old' school." The general assembly had some years before passed resolutions enjoining loyalty to the government, approving the emancipation proclamation, and denouncing slavery, and had given instructions to the proper authorities that if any of the ministers or members had been actively engaged in the Rebellion, or held the views of the Southern Presbyterian Church, they should be required to repent and forsake their sins.   Some Presbyterians, in consequence of this action of the assembly, adopted and published what was called, "A declaration and testimony against the erroneous and heretical doctrines and practices which have obtained and been propagated in the Presbyterian Church of the United States during the last five years." They further denounced the action of the assembly, and declared an intention to refuse to be governed by such action, and invited coöperation in a concerted resistance to the usurpation of authority by the assembly.   The assembly in turn denounced "the declaration and testimony," and declared that every presbytery that refused to obey its orders should be *ipso facto* dissolved, and called to answer before the next general assembly; and in case a presbytery did not so answer, it was to be dissolved, and the ministers and elders who adhered to the general assembly were to constitute the presbytery.   A presbytery was found to contain among its members one or more of the signers of the "declaration and testimony," and was upon motion declared to be dissolved.   The party which adhered to the general assembly was recognized by that body to be the legal presbytery; the "declaration and testimony" party formed another presbytery, claimed recognition from the assembly, which was

27 OR.—59.

refused, and elected trustees of the college. It was held that this so-called presbytery had no right to elect trustees; that the action of the general assembly in passing these resolutions, and deciding that the "declaration and testimony" party did not constitute a legal presbytery, could not be questioned in the civil court. The court says: "Whether the 'declaration and testimony' signers were regularly or irregularly before the assembly was for it alone to determine. The utter impolicy of the civil courts attempting to interfere in determining matters which have been passed upon in church tribunals, arising out of ecclesiastical concerns, is apparent." An almost unbroken line of authorities holds that, upon any violation of the articles of faith or rule of discipline, or other law, custom, or usage of the church, the judgment of the church court is binding upon the members so offending, and will not be reviewed by the civil courts.

The benefit of the society to the member, in consideration of his obedience to its rules, customs, and usages, constitutes the contract of membership. He assumes these obligations voluntarily, and agrees to be bound by them. If he disobey these rules, he also agrees to abide by the church's judgment. Shall the courts make for him another or different contract? All they can do is to interpret the contract he has made. The severest penalty such societies can enforce is excommunication. This, however, should be according to the prescribed rules of the society. He should be charged with the offense, have notice of the time and place of hearing, be permitted to offer evidence, and make his defense. This would be a trial, and the judgment, if not appealed from to some higher judicature of the same society, would be conclusive as to him, and binding upon the civil courts. Nor would the courts inquire into the mode of procedure of these church trials, upon the pre-

sumption that such tribunals were the best judges of their own rules. These conclusions have been reached by the civil courts upon trials and judgments had by the society; trials in which there were two or more parties (the society against the member,) an issue to be disposed of, and a conclusion to be reached by the society after due consideration. The question to determine then, is whether the action of the general conference of eighteen hundred and eighty-nine, upon the adoption of the report of this special committee, was legislative or judicial in its character. If it was an adjudication, and did not involve any question of life, liberty, or property, then no question can be raised as to its jurisdiction; if legislative, then null and void as being in conflict with the constitution of eighteen hundred and forty-one, for lack of the necessary request. That this is a question of ecclesiastical law, within the meaning of the rule laid down by Mr. Justice MILLER in *Watson* v. *Jones,* 80 U. S. (13 Wall.), 679, we think there can be no doubt.

In the cases above cited upon this proposition all the questions were before the church courts to be adjudicated. They were trials. This church exercises legislative as well as judicial authority. What are the tests for determining whether the action of the conference was an adjudication or legislation? The business of the legislature is to make general laws for the public good; that of judicial tribunals, to make specific settlements of private disputes. One establishes laws for future action, and is prospective; the other applies established laws to past actions, and is retrospective in its operation. The law is made by one and applied by the other. Applying this distinction to the acts of the conference, it would appear that it was intended for the future public good of the society. It was a rule of action for future

conduct. It was not applying the law to past actions. It was not à conclusion and judgment for past offenses. It was not a punishment for a violation of any rule of faith or discipline. It was not a conclusion that any ecclesiastical law, custom, or usage of the church had been disobeyed. Nor was it retrospective in its operation. The general conference of eighteen hundred and eighty-five, in raising the commission and prescribing its duties, was legislating in the interest of the future welfare of the church. It was doing nothing more at the session of eighteen hundred and eighty-nine, when the acts of the commission were approved. The general conference of eighteen hundred and eighty-nine could not do by legislation retrospectively what it could not do directly. "It cannot make good retrospectively acts or contracts which it had and could have no power to permit or sanction in advance": Cooley on Constitutional Limitations (5th ed.), 471. While it is true that a member agrees to be bound by the rules of the society, and that the majority may expel him for any violation thereof, is it not true that a part of his contract of membership is that the majority will be bound by its rules also? Has not the minority some rights which the majority are bound to respect? And has not the minority a right to believe that the majority will be governed by its highest law, the constitution? Such legislation, if sanctioned, would impair the contract of membership. To reach any other conclusion would be to assume that the constitution of a voluntary society was binding only on the minority; that the majority were under no legal obligations to obey its terms, and could alter it at any time without pursuing the mode prescribed in the instrument itself; that the majority could declare white was black, in defiance of the terms of the constitution, and it was

so, and the minority had no remedy except to withdraw from the society.

The conclusion reached in the foregoing precludes the necessity of any consideration of the revised confession of faith, as to whether or not there was any change therein, or as to whether the same was properly or improperly made. Therefore the decree of the court below is reversed, the injunction dissolved, and the bill dismissed.

Judge BEAN having participated in the trial in the court below, did not sit in this case.

[37 Pac. 102; 26 L. R. A. 85.]

Opinion of MR. JUSTICE WOLVERTON.

It is unfortunate that it should become necessary in any case to call into requisition the courts of civil jurisdiction to determine and settle controversies arising within the pale of the church, and it is peculiarly so in the present instance, wherein the judicial mind has not been able, after years of litigation, to uniformly and satisfactorily solve the questions involved, or to apply to facts touching the controversy such a clear and indubitable rule of law as will result in conviction to those in interest, fix the exact status of the contending elements in the church, and forever set at rest the title to the immense amount of property involved. The constitution of the United States has guaranteed to the people thereof both civil and religious liberty. This guaranty extends as well to the encroachments of the state or civil government upon the rights, privileges, and immunities of the church, as of the church upon those of the state. It has brought about an entire and distinct separation of church and state, and is in con

sonance with a free and enlightened statehood. But, as was said in *Watson* v. *Jones,* 80 U. S. (13 Wall.), 713, by MILLER, J.: "Much as such dissensions among the members of a religious society should be regretted, a regret which is increased when, passing from the control of the judicial and legislative bodies of the entire organization to which the society belongs, an appeal is made to the secular authority,—the courts, when so called on, must perform their functions as in other cases." The Church of the United Brethren in Christ is a voluntary unincorporated religious association, having a written confession of faith, constitution, and book of discipline. The government of the church is exercised through a series of judicatories, known as the official board, quarterly, annual, and general conference, which latter meets quadrennially, and is the highest legislative and judicial body of the church. The plaintiff is a corporation, duly incorporated under the general laws of this state, and its object "was and is to acquire and hold property in trust for said church," to build and maintain an institution for educational purposes, to be carried on under the direction and control of trustees to be appointed from time to time by the Oregon annual conference, which, like all other annual conferences of the church, is subject to the general conference. So that the trustees appointed by the annual conference are but agents through whom the property in question is held for the use and benefit of the church. At the general conference held at York, Pennsylvania, in May, eighteen hundred and eighty-nine, a revised confession of faith and constitution was adopted. Fifteen members of that conference, feeling aggrieved at the manner in which said revised confession of faith and constitution was adopted, withdrew, and met at another place in the same city of York, and

there organized another conference; rejected, as not binding upon them, the revised confession of faith and constitution; and, claiming to act under the old confession of faith and constitution, transacted such business as was brought before them.  Since that date there have been two general conferences, the defendant trustees being appointed under the authority of the conference claiming to act under the old confession of faith and constitution, and the plaintiff being represented by trustees appointed under the authority of the general conference maintaining the revision.  So that the question to be decided is, which of these two general conferences is the real conference of the Church of the United Brethren in Christ.

11.  The real question, therefore, involved in this case is one of identity.  Whatever other questions arise during the course of its examination are merely incidental and secondary.  Did the adoption of the revised confession of faith and constitution by the conference at York, waiving the question for the present whether adopted in strict accord with the then recognized constitution or not, change or destroy the identity of the church?  If it did, the defendant trustees are the rightful representatives of the church and of the plaintiff corporation, as they are commissioned by the conference acting under the recognized confession of faith and constitution thereof.  If it did not, then the action of those who withdrew from the regularly called and constituted conference at York, against the wishes of the majority, and organized another general conference distinct and apart from the one so regularly called and constituted, is without authority and void.  In the very nature of the form of government of the society it can have but one general conference. "The title to church property of a divided congregation is in that part of it which is acting in harmony with its

own law; and the ecclesiastical laws, usages, customs, and principles which were accepted among them before the dispute began are the standards in determining which party is right": 1 Waterman on Corporations, (8th ed.), § 19.  Or, as was said in *McGinnis* v. *Watson,* 41 Pa. St. 20:  "It seems very plain that we must judge these people and their acts relative to this dispute by the ecclesiastical laws, usages, customs, and principles which were accepted among themselves before the dispute began, and ascertain which party is right, tried by that standard."  This case is cited with approval in *First Presbyterian Church of Louisville* v. *Wilson,* 14 Bush (Ky.), 278, and the language of the syllabus thereof adopted by the court.  See also Niblack on Mutual Benefit Societies, § 158.  "Courts of law will inquire which party or which division adheres to the form of church government  *  *  *  This rule  *  *  *  necessitates an inquiry into the constitution and discipline of the church  *  *  *  to enable the court to discover which of the contending parties adheres to the order": Lectures on Relation of Civil Law to Church Polity by Justice Strong, (45 and 59,) cited in brief of William Lawrence. In *First Presbyterian Church of Louisville* v. *Watson,* 14 Bush (Ky.), 278, the court, speaking through COFER, J., says: "It thus appears that a Presbyterian congregation or particular church is a body of professing Christians and their children, governed by congregational, presbyterial, and synodical assembles; and consequently there can be no such thing as a Presbyterian congregation or church not having a church session, and not being in connection with and governed by a presbytery and synod.  Connection with and subjection to the recognized presbyterial system of government is as essential to constitute a Presbyterian church or congregation as belief in the West minster confession of faith.  Faith and government

are alike and equally necessary to constitute a Presbyterian church, and a church having no other than a congregational government, although adopting the Presbyterian creed, is no more a Presbyterian church than a congregation governed by the presbyterial system, and adopting the thirty-nine articles of faith of the Episcopal Church." Thus, it will be seen that church identity, when disputes arise, depends not alone upon its peculiar creed and dogmas, but also upon the constitution and form of government, discipline, usages, customs, and principles maintained by it prior to the dispute or division. The scope, therefore, of investigation, for the purpose of discovering or fixing the identity of the genuine conference, comprehends all these necessary elements. Measured by this standard, the identity of the Church of the United Brethren in Christ, and its general conference, in the present case, must be ascertained and determined by reference to its confession of faith or fundamental doctrines, constitutional or fundamental law, book of discipline, and its usages and customs prior to the division of the church at York, Pennsylvania.

12. I shall first consider whether there has been a change in the confession of faith or fundamental doctrine of the church. When I speak of a change, I mean one that is material and vital to the established tenets and doctrines of the church, as it is not every trivial transmutation of phraseology, or every addition to the so-called confession of faith, *eo nomine,* where taken or transposed from the discipline to that particular instrument, that will destroy church identity. I cannot see how the dogmas of the church are changed or destroyed by transferring doctrine previously contained in the discipline to the confession of faith, or *vice versa.* The fundamental belief remains the same. For instance, if justification and sanctification are doctrines to which all members of

27 OR.—60.

the church must subscribe before they can become such, how can it become important whether they are contained in the confession of faith, *eo nomine,* or in the discipline? There must be a radical change of faith or doctrine: *Lutheran Congregation of Pine Hill Trustees* v. *St. Michael's Evangelical Church,* 48 Pa. St. 21; *Fadness* v. *Braunborg,* 73 Wis. 292. I shall now advert to some of the alleged changes which it is claimed have been made in the confession of faith. It is a solemn matter to invade the domain of religious beliefs and dogmas, to explore doctrine, and decide intangible metaphysical questions pertaining to the godhead; and courts have a delicacy in entering upon this field of investigation, and will not do so unless it is necessary for the purpose of determining questions of civil or property rights. If these matters have been determined by the proper church judicatories, the civil courts will accept such decisions as final, and will not look into or disturb them. It is said that there have been added to the confession of faith articles declaring a belief in "depravity," "justification," "regeneration and adoption," "sanctification," and "endless punishment." If it be admitted that such is the case, it does not follow that these are new doctrines or dogmas adopted and sanctioned by the general conference for the first time, and I think no such claim has ever been made by that portion of the church membership known as "Radicals." Turning to the book of discipline of eighteen hundred and thirty-seven, section 7, it will be seen that every person desiring license to preach is required to state his "knowledge of faith, of repentance, of justification, sanctification, and redemption," and every book of discipline issued from that date to this contains the same requirement. As touching the doctrine of depravity, a resolution was adopted in eighteen hundred and fifty-three, by a vote of twenty-three to nineteen, defining the same.

The book of discipline of eighteen hundred and sixty-one requires a person desiring to be received as a preacher to answer in the affirmative the following question: "Do you believe that man, abstract, of the grace of our Lord Jesus Christ, is fallen from original righteousness, and is not only entirely destitute of holiness, but is inclined to evil, and only evil, and that continually, and that except man be born again he cannot see the kingdom of God?" This requirement, with slight change in phraseology, is continued in every book of discipline issued since that date. The book of discipline of eighteen hundred and seventy-seven requires the following question to be propounded to an elder preparatory to his ordination: "Do you believe in future everlasting punishment?" This is continued in the later publications of the discipline. The course of reading and study prescribed by the discipline for many years last past for licentiate preachers, and upon which they are required to be examined, touching "Bible doctrine," comprises "human depravity, the atonement, redemption, repentance, justification by faith, regeneration, adoption," etc. So that, in the usages and customs of the church, and by the discipline, the doctrines promulgated touching all these articles of faith have been repeatedly and continuously recognized and sanctioned by the church. This society has for many years past been committed to each and all these articles of faith or church dogmas which it is now claimed are destructive of the church by reason of having been added to the articles of faith, *eo nomine.*

13. The rule is quite uniform that whenever questions of discipline, or of faith, or ecclesiastical rule, custom, or law, have been decided by the highest church judicatories, such decisions are accepted by the legal tribunals as final: *Watson* v. *Jones,* 80 U. S. (13 Wall.), 727; *German Reformed Church* v. *Commonwealth,* 3 Pa. St. 291; *McGin-*

*nis* v. *Watson,* 41 Pa. St. 21; *State* v. *Farris,* 45 Mo. 184; *Robertson* v. *Bullions,* 9 Barb. 134; *Harmon* v. *Dreher,* 1 Spear's Eq. 87.   But it is claimed that the action of the general conference in the revision of the church creed, and in the adoption of all resolutions touching the legality of such revision, was legislative and not judicial.   With this view I concur.   The general conference of the United Brethren in Christ, as was said of the general assembly of the Presbyterian Church in *Commonwealth* v. *Green,* 4 Whart. 61, "is a homogenous body, uniting in itself, without separation of parts, the legislative, executive, and judicial functions of the government; and its acts are referable to the one or the other of them, according to the capacity in which it sat when they were performed."   The nature of the business in hand must determine whether it is referable to the one branch or the other.  . Mr. Justice MOORE, in his very able opinion heretofore rendered in this case, says: "The business of the legislature is to make general laws for the public good; that of judicial tribunals to make specific settlements of private disputes. One establishes laws for future action, and is prospective; the other applies established laws to past actions, and is retrospective in its operation.   The law is made by the one and applied by the other.   Applying this distinction to the acts of the conference, it would appear that it was intended for the future public good of the society.   It was a rule of action for future conduct.   It was not ap_ plying the law to past actions.   It was not a conclusion and judgment for past offenses.   It was not a punishment for a violation of any rule of faith or discipline. It was not a conclusion that any ecclesiastical law, custom, or usage of the church had been disobeyed.   Nor was it retrospective in its operation": *Ante,* p. 459 (31 Pac. 219).   And Judge Cooley says: "That which distinguishes a judicial from a legislative act is that the one

is a determination of what the existing law is in relation to some existing thing already done or happened, while the other is a predetermination of what the law shall be, for the regulation of future cases falling under its provisions. The legislative power extends only to the making of laws. To construe and apply the law is the peculiar province of judicial power. It is the province of judges to determine what is the law upon existing cases. In fine, the law is applied by the one and made by the other. To do the first, therefore, to compare the claims of the parties with the law of the land before established is in its nature a judicial act": Cooley on Constitutional Limitations, 110. The claim is that the general conference of eighteen hundred and eighty-nine, in adopting the report of the special committee of seven, is judicial, and therefore binding upon the courts. The proceedings of the general conference of eighteen hundred and eighty-five, and of the commission appointed by it, did not effectuate the amendment. It was effected through the adoption by the general conference of eighteen hundred and eighty-nine of the report of the special committee of seven. The adoption of this report adopted the amendment. The proceeding is not perhaps in strict accord with recognized parliamentary usages, but the legal effect was as above stated, considering the method by which the conference transacted its business. It is in effect the same as if a legislative assembly should refer a bill to the judiciary or other proper committee, or a special committee, to determine the constitutionality thereof, and such committee should report the bill back declaring it constitutional, and in pursuance thereof the bill should pass. The appointment of the committee of seven, its report and the adoption thereof by the conference of eighteen hundred and eighty-nine, was the method pursued for the accomplishment of the necessary legislation to effect the

adoption of the revised confession of faith and constitu-
tion.   It was legislation solely, and could not, in the very
nature of the business transacted, be anything else.   No
one will contend that one and the same act can be both
judicial and legislative, and hence the action of the con-
ference upon the report of the committee of seven was
not judicial.

14.  As to whether there has been any material
change in the articles of faith, the action of the gen-
eral conference, sitting as a legislative body, ought to
determine.   The respect which one coördinate branch
of the government maintains towards another ought to
apply as well where a court of civil jurisdiction is con-
sidering the legislative acts of an ecclesiastical body;
and when such body, acting in its legislative capacity,
has placed a construction upon its acts, there is no good
reason why the civil courts should not respect and even
adopt such construction, unless the same is shown to be
clearly and palpably contrary to some constitutional
prohibition.   "Every presumption is in favor of the
validity of legislative acts, and they are to be respected
unless there is a substantial departure from the organic
law": *People* v. *Briggs,* 50 N. Y. 558.   Judge Cooley says:
" The constitutionality of a law, then, is to be presumed
because the legislature, which was first required to pass
upon the question, acting, as they must be deemed to
have acted, with integrity, and with a just desire to
keep within the restrictions laid by the constitution
upon their action, have adjudged it to be so": Cooley
on Constitutional Limitations (5th ed.), 219.   The pow-
ers of the commission were, by the act of the confer-
ence of eighteen hundred and eighty-five, which ap-
pointed it, limited and defined as follows: "*First,* that
the commission shall preserve unchanged in substance
the present confession of faith, so far as it is clear;

*second,* that it shall retain the present itinerant plan; and, *third,* that it shall keep sacred the general usages and distinctive principles of the church on all great moral reforms, as sustained by the Word of God, in so far as the province of this work may touch them." As touching the work of the commission, the majority report of the committee of seven says: "We have also compared the instructions and limitations by the former general conference with their work as finally adopted by said commission, and find that said instructions and limitations were obeyed and carried out with commendable accuracy." This report was adopted by the conference. Here, then, is legislative action declaring the fact to be that the confession of faith, so far as it was clear, has been preserved unchanged in substance. This legislative action of the general conference, composed of the very able divines of the church, is evidence of the highest character touching these questions of faith, and is entitled to great weight. And we are not without other contemporaneous evidence bearing upon the question of change. In all the discussion which took place in the conference of eighteen hundred and eighty-nine the "Radicals" do not appear to have attacked the confession of faith, as reported from the commission. One member, high in the councils of the conference, toward the close of the debate, said: "Is it not marvelous that not a brother on the other side of the house, from Brother Barnaby to Bishop Wright, has said a word against the work of the commission itself? They have not said anything against the confession of faith, as it has been formulated and presented to us. They do not say it is any different from the old one, or that there is any heresy in it. * * * It corresponds with the old. It expresses it better, and in a more beautiful and orderly form than the old one

did. It also brings in some doctrines that were scattered through the discipline in various forms, and they are put in new arrangement." Aside from all this, leading bishops of the church have testified that in their judgment there is no substantial difference between the two. So that, considering the alleged change in the confession of faith and the materiality thereof as a question of fact, and the evidence adduced pertinent to that issue, there is but little doubt that the great weight of testimony is against the contention of the defendants to this suit; and I therefore conclude that the revision of the confession of faith has not wrought such a change in substance in the fundamental doctrines and dogmas of the church as to subvert and destroy church identity.

15. I will now consider whether the constitution of the church has been so changed as to destroy church identity. It is said that religious organizations stand in the same attitude as other voluntary associations for benevolent or charitable purposes, and that "all who unite themselves to such a body do so with an implied consent to its government, and are bound to submit to it": *Watson* v. *Jones,* 80 U. S. (13 Wall.), 729. Or, as said by COFER, J., in *First Presbyterian Church* v. *Wilson,* 14 Bush. (Ky.), 278, "Religious societies are regarded by the civil authority as other voluntary associations, the individual members and separate bodies of which will be held to be bound by the laws, usages, customs, and principles which are accepted among them, upon the assumption that in becoming parts of such organisms they assented to be bound by those laws, usages, and customs, as so many stipulations of a contract between them." So the constitution of the United Brethren in Christ that was binding upon that society prior to the dispute, may be regarded as a contract between the church and its members, and be-

tween the individual members thereof.   An attempt at
this late day to trace the history of the adoption of the
constitution of eighteen hundred and forty-one, or to dis-
cuss the process by which it was formulated and ratified
by the members of the church, would be a useless task;
it is sufficient to know that it has been recognized by the
church and its members, and treated by all concerned as
valid and binding, for a period of about fifty years.
Whether legally adopted or not, it has been acquiesced in
for such a great length of time that I am not now dis-
posed to declare the instrument to be any other than that
which both parties to this suit have always regarded and
treated as genuine antecedent to the incidents which
gave rise to this litigation.

16.   The constitution of eighteen hundred and forty-
one is the compact by which this church and its members
were bound prior to the dispute.   It is a brief document,
and omits all mention of many of the fundamental prin-
ciples upon which the church government is founded.
For the purpose of ascertaining these omitted principles
it is necessary to look to the discipline, usages, and cus-
toms of the church.   For instance, an annual or quarterly
conference is not defined, the number of representatives
to the general conference is not fixed, nor does it under-
take to regulate any basis upon which such representa-
tion shall be chosen.   It does not constitute or create a
single officer of all these church bodies, nor does it de-
fine their duties except that bishops are "to be con-
sidered members and presiding officers."   The preamble
sets forth, among other things, that the purpose of adopt-
ing the constitution was "to define the powers and the
business of quarterly, annual, and general conferences,
as recognized by this church," but a reference to its pro-
visions shows that it failed to do either, except so far as
relates to the powers and business of the general confer-

ence. By section 1, article I, "All ecclesiastical power herein granted to make or repeal any rule of discipline is vested in a general conference." Upon looking to the constitution alone for the grant of power, if effect is given to the words "herein granted," none will be found "to make or repeal any rule of discipline," except it can be extracted from the first four sections of article II, giving power to the general conference "To define the boundaries of the annual conferences; to elect bishops; to try, by impeachment, the annual conferences, and to hear appeals." But if we take a broader view of this constitution, and regard it as state constitutions are regarded, as a limitation, and not a special grant, of power, the words "herein granted" become inoperative, and it becomes a general grant of power "to make or repeal any rules of discipline," being in effect authority to exercise "all the usually recognized powers of legislation not actually prohibited or expressly excepted": *Southern Pacific Railroad Company* v. *Orton,* 6 Sawy. 185 (32 Fed. 457). This is the light in which the general conferences have always considered this constitution, if we are to judge by the class of legislation which has been adopted by it from time to time. In fact, the general conference has been accustomed to go much farther, and has constantly and for years past exceeded even "the usually recognized powers of legislation." Whatever there is of the form of church government has been established by the general conference, through the discipline, and the discipline at this time contains more of the principles of church government which are regarded as fundamental than either the old or the revised constitution. Ever since the revolution of sixteen hundred and eighty-eight, the British parliament has been conceded the power to enact fundamental as it does statute laws, by bill, passed through the regular stages of legislation and approved by the

sovereign: Jameson on Constitutional Conventions, 547. And such have been the usages and customs of the general conference by a long course of legislation. So that we must not look to the constitution alone for the fundamental principles or form of church government, but must look also to the discipline.

17. The constitution of eighteen hundred and forty-one contains, for the most part, express limitations of power upon the general conference. Of such are the following: Article II, section 4. "No rule or ordinance shall at any time be passed to change or do away with the confession of faith as it now stands, nor destroy the itinerant plan." Section 7. "There shall be no connection with secret combinations, nor shall involuntary servitude be tolerated in any way." And Article IV. "There shall be no alteration of the foregoing constitution unless by request of two thirds of the whole society." No one will contend that this constitution can be legally changed except by the method therein provided, nor will any one seriously contend that the general conference had the power to change or do away with the confession of faith without the constitution being first regularly and legally modified so as to delegate such power to that body, or rather to remove the limitation upon its powers; but it does not follow that because the general conference attempted to legislate contrary to these express limitations the constitution or the form or fundamental principles of church government are thereby abandoned or set at naught. The legislation may be void, but why should it necessarily work an abandonment of the constitution or the creed of the church? There are only three changes of importance attempted or made by the revised constitution: *First,* the provisions for lay delegation in the general conference; *second,* the amendment with regard to secret combinations; and, *third,* the method provided for

the amendment of the constitution. None of these affect the form of government or church polity. The official board, quarterly, annual, and general conferences, all remain and have their usual places, possessing their accustomed powers in the plan of church organization and government. The officers of all these bodies, and their rights and duties remain the same. The clauses touching the confession of faith, right of appeal, human slavery, church property, itinerant plan, the rights of local preachers to their votes in the annual conferences, are all in effect unchanged. It is true the three exceptions above enumerated have revised the constitution somewhat, but the form and general plan of church government is not destroyed,—the church polity remains the same. The agreement which the constitution implies has not been abrogated, and the most that can be said is that the general conference has violated the terms of the compact, for which the courts will afford an appropriate and ample remedy. Suppose the legislative assembly of Oregon was to pass an act extending to women the right of suffrage. This would not be an abrogation of the constitution which inhibits women from voting, but it would be a violation of that instrument, for which the courts would afford an appropriate remedy. The legislature of the state of Mississippi, in the year eighteen hundred and fifty-four, passed an act proposing to amend the constitution by abolishing the superior court of chancery, and establishing "chancery courts with full jurisdiction in matters of equity to be held in each judicial district by the circuit judge thereof, at such times and places as may be directed by law." This proposed amendment was ratified by the people in eighteen hundred and fifty-five, and in eighteen hundred and fifty-six was inserted by the legislature in the constitution, and was afterwards held constitutional by a divided court:

*Green* v. *Weller,* 32 Miss. 650.    No one contended that the amendment was revolutionary, although it was thought by many to have been unconstitutionally adopted.    If laymen have no right to sit in the general conference, courts will in a proper case prevent them from sitting, and so in regard to the other alleged amendments to the constitution.    Where there is a wrong there is a remedy.

I concede the proposition laid down by TAFT, J., in *Brundage* v. *Deardorf,* 55 Fed. 846, that "an open, flagrant, avowed violation of the original compact" may be "necessarily a withdrawal from the lawful organization of the church," but the facts as presented here do not disclose that the general conference has been guilty of any such acts.    No fraud is even alleged by the defendants, as was the case by the complainants in *Brundage* v. *Deardorf.* Both the conferences of eighteen hundred and eighty-five and eighteen hundred and eighty-nine acted in entire good faith, and in the belief that their proceedings were constitutional.    GRANT, J., in his dissenting opinion in *Bear* v. *Heasley,* 98 Mich. 279, (24 L. R. A. 615, 57 N. W. 276,) states very clearly the proposition under consideration thus: "Grant that the action of the conference was illegal in declaring the amendments adopted.    It is, indeed, a startling proposition that by this act the conference destroyed its identity, ceased to represent the church, seceded from it, and thereby became a new and different church.    The proposition finds no principle in law, equity, or good sense upon which to stand.    The fifteen who left the regularly constituted conference became the seceders, and not those who remained in it.    If the defendants are right in their contention, it would follow that if the conference had been a unit in declaring the amended constitution adopted, in which event its action would have been no more binding than now, the members of the local church might have seized the

church property, on the ground that they were the sole representatives of the true church, and that all the others were heretics. The minority in this case have mistaken their remedy. They should have pursued a legal and orderly course, which was clearly open to them. They should have protested, and, failing in this, have applied to the proper courts to determine the validity of the proceedings to adopt the amended constitution; and if such courts found them void, they would hold the old constitution in force, and compel the officers of the church to recognize and act under it." SHAW, C. J., in *Earle* v. *Wood,* 8 Cush. 458, says: "What we mean to say is this: that if, after solid and weighty consideration, humbly and conscientiously awaiting the guide of best wisdom, the yearly meeting should fully unite in the proper as well as the Quaker sense of that term, in adopting some modification of their creed or of their speculative opinions, adhering to their great principles of love and fraternal duty, it would, upon their professed principles, seem too much to say that they would thereby cease to be Quakers, and cease to be the Society of Friends. * * * All disaffected members, having full liberty of conscience, might undoubtedly dissent from such opinions, and adopt different tenets; perhaps they might by so doing become better theologians, better Christians, and better men; but they would cease to be Friends in unity with such yearly meeting, and with the meetings and individuals subordinate to it. Such dissenting individuals might form themselves into yearly, quarterly, and monthly meetings; but this would be a new organization, and not the identical body to which they had been formerly attached."

There is a class of cases holding that where a member of an unincorporated voluntary association violates the rules of such association, he loses his rights and privileges as such member, and even forfeits his right

of membership, upon the ground that when he becomes a member he is presumed to know the rules thereof, and that he agrees and consents to be governed thereby, and that a violation of such rules is a breach of his implied contract, and consequently a forfeiture of his rights and privileges as a member of such association.    Of such is *White* v. *Brownell,* 2 Daly, 359; *Hyde* v. *Woods,* 2 Sawy. 655, (Fed. Cas. No. 6975, 94 U. S. 523); *Ebbinghousen* v. *Worth Club,* 4 Abb. N. C. 300; *Leech* v. *Harris,* 2 Brewst. 571; *Innes* v. *Wylie,* 1 Car. and K. 262; *Venable* v. *Baptist Church,* 25 Kan. 177; *Protchett* v. *Schaffer,* 11 Phila. 166.   But none of these authorities go to the extent of holding that where the legislative branch of the highest judiciary of the church, at a general conference duly elected and lawfully convened, passes an act or ordinance contrary to or not in strict harmony with the constitution, or otherwise does an illegal act, it is necessarily an act of secession, and in subversion of the whole church government, without regard to whether the act itself constitutes a substantial or radical change in the form of church government or church polity which formerly obtained.   The fifteen who left the regularly constituted conference composed of one hundred and thirty members, and organized a separate and distinct organization, although holding to the tenets and doctrines of the United Brethren in Christ, and adopting its form of church government and its discipline, became the seceders: *Methodist Church of Cincinnati* v. *Wood,* 5 Ohio, 288; *Ferraria* v. *Vasconcelles,* 23 Ill. 456; *Shannon* v. *Frost,* 3 B. Mon. 253; *Gibson* v. *Armstrong,* 7 B. Mon. 431; *Trustees* v. *St. Michael's Evangelical Church,* 48 Pa. St. 20.   I take it, therefore, that there has not been such a radical or substantial change in the constitution as to be subversive of church government and church polity, as it existed prior to the dispute, and that the church identity remains the same; consequently the

Liberals, in contradistinction to the Radicals, are entitled to the property involved herein.

18. But if it is at all a doubtful proposition as to whether the identity of the church has been destroyed, there is another question upon the proper solution of which the decision of this case may rest. Has the constitution been changed or revised in the manner provided therein? The old constitution provides (article IV): "There shall be no alteration of the foregoing constitution, unless by request of two thirds of the whole society." "Though it is not expressly stated, the only meaning that can be given to the constitution is that the amendment of the constitution is to be made by the general conference. And this power is limited by requiring the request or approval of two thirds of the entire society to give the amendment validity": *Brundage* v. *Deardorf,* 55 Fed. 848. Much discussion has centered about the word "request," the Radicals claiming that it is a "condition precedent to the power to act," that it is active, voluntary, and must be the moving cause of the proposed amendment; the Liberals contending that it simply means a vote, an expression of assent or a passive concurrence, without regard to time, as relates to the adoption of an amendment, so that it precedes or is contemporaneous therewith. I do not think the clause of the constitution referred to should receive a strict construction, nor do I think the word "request" should bear a technical meaning. It was undoubtedly the intention of the framers of the constitution that before the general conference could make any change in that instrument it must be preceded by an expressed desire of two thirds of the body of the church, "the whole society," favoring the change. It is highly improbable that at any time "two thirds of the whole society," or any considerable number of the members thereof, would spontaneously and

with one accord request or signify their desire to the general conference, that a change should be made in the constitution. Some organized effort among such a numerous membership would be necessary to obtain unison of action and contemporaneous results. Hence it would not be contrary to the spirit of the constitution for any member, or minister, or any body of the church to devise any method that should seem most expedient, and effect such organization as would appear most appropriate, for obtaining an expression of the membership, and ascertaining the aggregate result with reference to such change. The general conference being charged with the duty of looking to the general welfare of the church, it would seem quite natural and appropriate that it should take a matter of such importance in hand, and devise ways and means of obtaining an expression of the membership. Now this is just what the general conference of eighteen hundred and eighty-five did. Its action was taken for the purpose of obtaining an expression of the members touching a revision of the constitution and creed. It provided for devising a method by which the aggregate of individual expression might be ascertained. This proceeding not being inhibited by the constitution, and being the legislative will of the conference, carried with it the impress of law.

TAFT, J., in *Brundage* v. *Deardorf,* 55 Fed. 846, says: "I do not attach any particular importance to the word 'request,' as indicating that it is a condition precedent to the action of the general conference. It would seem that all that was intended was that no amendment of the constitution should go into effect until two thirds of the whole society should agree thereto. The constitution is inartificially drawn, and the expression 'request,' should not have a narrow meaning. Nor do I think there is anything in the article or in the constitution which prevents

27 OR.—62.

the general conference from lawfully taking steps look-
ing to the amendment of the constitution in accordance
with its terms. It would seem to be a legitimate exercise
of the supreme legislative power of the general confer-
ence to enact an ordinance that upon a certain day the
expression of the society should be taken by vote upon
the question whether the constitution should be amended
in a certain way. While the constitution was adopted at
a time when the church was smaller than it is now, the
hope of the founders, doubtless, was that it would extend
the country over. It is not to be presumed that they in-
serted in the constitution a provision which, while it pro-
fessed to give the power of amendment, imposed such
limitations as to make it practicably impossible. There-
fore, I am of the opinion that the general conference of
eighteen hundred and eighty-five had the right to ap-
point a commission to prepare a revised and amended
constitution, and fix a time at which the vote of the
church should be taken to signify the desire of the
church that the amended constitution should be adopted.
It may be conceded, though it is not now decided, that it
was also within the legitimate powers of the general con-
ference to provide that, if two thirds of those voting at
the time upon the amendment should be in favor of the
new constitution, it should be held to be two thirds of the
entire society, on the ground that if notice was given to
the entire society of such a rule, then a failure to vote
would be an acquiescence in the vote of those who did
vote. But, to make such provision lawful, full and am-
ple notice of this requirement, and of the day of the elec-
tion, should be given to each member of the church."

19. Nor did the conference delegate to the commis-
sion legislative powers: *Schweiker* v. *Husser*, 146 Ill. 399
(34 N. E. 1022). The commission organized by it was
a lawful body, created for a lawful purpose, and intrust-

ed with legitimate powers, clearly and explicitly limited and defined.

20. The general conference, acting in its legislative capacity, could lawfully declare that two thirds of all the votes cast should be deemed two thirds of the whole society, as a basis of ascertaining the wishes of the society with reference to a change or revision of the constitution and confession of faith: *Re County Seat of Linn County,* 15 Kan. 500; *State* v. *Sutterfield,* 54 Mo. 305; *Vance* v. *Austell,* 45 Ark. 407. In the case of *County Seat of Linn County,* 15 Kan. 500, it appears that the constitution of Kansas provides (article IX, section 1): "No county seat shall be changed without the consent of a majority of the electors of the county," and the legislature enacted that "the place receiving a majority of the votes cast shall become the county seat." BREWER, J., delivering the opinion of the court, says: "It seems to us, therefore, that where the legislature has provided an election as the means of ascertaining the wishes of the electors of the county in reference to a change of the county seat, and has made no provision for a registration, and has designated no other list or roll as the evidence of the number of electors, it may, under the constitutional provision quoted, declare that the place receiving a majority of the votes cast shall be the county seat." The constitution of Missouri provides that "The general assembly shall have no power to remove the county seat of any county unless two thirds of the qualified voters of the county, at a general election, shall vote in favor of such removal." By an act of the general assembly it was provided: "If it shall appear by such election that two thirds of the legally registered voters of said county are in favor of the removal of the county seat of such county, then the county court shall appoint five commissioners," etc. In construing these provisions the court held in *State* v. *Sut-*

*terfield,* 54 Mo. 395, that it must look to the "legally reg-
istered voters" to ascertain whether two thirds had voted
for the change. And in *Vance* v. *Austell,* 45 Ark. 407, it
was held that "the constitutional provision that 'no
county seat shall be established or changed without the
consent of the qualified voters of the county' means a
majority of the qualified voters voting at the election,
and fixes this as the minimum vote necessary to effect a
removal, but does not prohibit the legislature from pre-
scribing a larger vote; and that section 1165, Mansfield's
Digest, which fixes the number assessed for poll tax on
the last assessment as the criterion of the number of
votes in the county is not in conflict with the constitu-
tion." These cases rest upon the principle that the leg-
islature may adopt as conclusive evidence of the fact any
mode of ascertaining the popular will which, according
to the ordinary rules of human experience, is best calcu-
lated to serve the purpose, so that it does not override or
set at naught the restrictions of the constitution. There
are, however, cases decided by the supreme court of
Tennessee, and one by the supreme court of Mississippi,
holding the contrary doctrine, but in the latest case
touching the question from the former state, (*Braden* v.
*Stumph,* 16 Lea, 593,) the court seems to be in doubt of
its own position. COOPER, J., who announced the opin-
ion of the court, says: "I am myself unable to see any
distinction between the meaning of the words 'consent,'
'concurrence,' and 'assent,' as used in the clause of the
constitution cited, and am inclined to think that the rule
adopted in *Louisville Railroad Company* v. *Davidson County,* 1
Snead, 692, (62 Am. Dec. 424,) for the construction and
application of analogous words in a statute, might well
have been followed in construing and applying the lan-
guage of the constitution." The case from Mississippi
(*Hawkins* v. *Board of Supervisors,* 50 Miss. 735) has been

reviewed by the United States supreme court—*Carroll County* v. *Smith,* 111 U. S. 556, (4 Sup. Ct. 539,)—which latter court refused to follow the doctrine therein announced.

21.   The date of taking the vote upon the revision of the constitution and confession of faith was fixed as definitely as was the date fixed by the custom of the society to vote upon the election of delegates to the general conference, "during the month of November, eighteen hundred and eighty-eight," and fair and ample notice of the time and manner of taking such vote was duly provided for and given to the members of the society.   The board of bishops was directed to prepare a letter addressed to the church on the work of the commission, to be published through the *Religious Telescope,* the official organ of the church, and otherwise, which was done in January, eighteen hundred and eighty-six, and the bishop's address, accompanied by the commission act, plan of submission, and proposed confession of faith and constitution, were distributed throughout the church immediately thereafter.   Here, then, is an election legally called through and in pursuance of the legislative act of the general conference of eighteen hundred and eighty-five. Applying, then, the basis fixed by the general conference for determining the vote of the society, two thirds of those who voted must be taken to be two thirds of the whole society, upon the ground that "all qualified voters who absent themselves from an election duly called are presumed to assent to the expressed will of the majority (in this case two thirds) of those voting, unless the law providing for the election otherwise declares": *County of Cass* v. *Johnston,* 95 U. S. (5 Otto), 369; *People* v. *Warfield,* 20 Ill. 159; *Taylor* v. *Taylor,* 10 Minn. 107; *Carroll County* v. Smith, 111 U. S. (4 Davis), 556; *St. Joseph Township* v. *Rogers,* 83 U. S. (16 Wall.), 644; *People* v. *Garner,* 47 Ill. 246; *People*

v. *Wiant,* 48 Ill. 263; *Re County Seat of Linn County,* 15 Kan. 500.   The vote cast in favor of the revised constitution being largely in excess of two thirds of the whole vote cast, the same was therefore legally adopted when it received the sanction of the general conference of eighteen hundred and eighty-nine.

22.   And it may be added in this connection that the section of the constitution placing a limitation upon the power of the general conference "to change or do away with the confession of faith as it now stands," may itself be legally changed by the society under the general provision for amendments.

23.   And even without amending such section, changes in the confession of faith might be made in the interest of clearness and completeness of declaration of belief in the doctrines actually held by the church, which may be found less fully stated in the confession of faith of eighteen hundred and forty-one: *Schlichter* v. *Keiter,* 156 Pa. St. 119 (22 L. R. A. 161, 27 Atl. 45).   These conclusions affirm the decision of the court below.

Mr. Justice MOORE, dissenting.

I am unable to agree with the conclusion reached by my brother, WOLVERTON, in this case.   I do not think any satisfactory reason has been presented for changing the former opinion, to which I still adhere.   Chief Justice BEAN having participated in the trial of the cause below, took no part in the hearing on appeal, and Mr. Justice WOLVERTON and myself being unable to agree, it follows that the decree must be affirmed.

AFFIRMED BY A DIVISION OF THE COURT.